The State of Ohio, Appellee, *v.* Woods, Appellant.
The State of Ohio, Appellee, *v.* Reaves, Appellant.

(Nos. 76-137 and 76-155—Decided December 1, 1976.)

128

Mr. *Simon L. Leis, Jr.*, prosecuting attorney, *Mr. Fred J. Cartolano, Mr. Robert R. Hastings, Jr.*, and *Mr. Merlyn Shiverdecker*, for appellee.

*Mr. Jack C. Rubenstein* and *Mr. Harry H. McIllwain,* for appellant Woods.

*Messrs. Gilday, Jung & Gilday, Mr. Bernard J. Gilday, Jr.,* and *Mr. D. Shannon Smith,* for appellant Reaves.

## I

STERN, J. In case No. 76-155, appellant Reaves raises three propositions of law. Two of these assert that Ohio's constitutional scheme for imposition of the death penalty is unconstitutional. That issue was decided by this court in *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, and need not be reconsidered here. Those propositions of law are overruled.

Appellant also claims error in the prosecution's inquiry upon *voir dire* into veniremen's opposition to capital punishment. Three prospective jurors were excused because of their opinions on capital punishment, and the record shows that each answered definitely that he could not join in a guilty verdict if the result was that the defendant might be sentenced to death. This court finds that no error was committed in excusing them as persons "otherwise unsuitable for any other cause to serve as a juror." Crim. R. 24(B)(14); *State* v. *Bayless, supra.*

## II

In case No. 76-137, appellant Woods raises similar claims relating to the constitutionality of Ohio's death penalty statutes, and also contends that the evidence was insufficient to prove an attempted robbery, or, in the alternative, that the defense had proved an abandonment of the offense, and that the charge of aggravated murder against Woods should accordingly have been reduced to murder.

There is no serious dispute concerning the facts of this case. Defendants Reaves and Woods decided to rob the manager of the United Dairy Farmers store by accosting him as he came out with the day's receipts; they "cased" the premises; Reaves climbed onto the roof, while Woods stayed behind as a lookout; Reaves then climbed back down, apparently having heard the nearby fire engine

siren; and Reaves and Woods then walked away, leaving Reaves' car behind.

R. C. 2923.02(A) provides that: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."

The committee comment for this section states, in part, that: "In order to prove an attempt to commit an offense, it must be shown that particular conduct directed toward commission of the offense took place and that such conduct, if successful, would constitute or result in the offense. * * *" This language establishes that the essential elements of a criminal attempt are the *mens rea* of purpose or knowledge, and conduct directed toward the commission of an offense. The statute does not, however, indicate how far this conduct must proceed toward the actual consummation of the crime in order to be considered an attempt to commit that crime. There is also little case law in Ohio on this question, although this court has held that the conduct necessary for a criminal attempt "need not be the last proximate act prior to the consummation of the felony." *State* v. *Farmer* (1951), 156 Ohio St. 214, 216, 102 N. E. 2d 11; *Fox* v. *State* (1878), 34 Ohio St. 377. In *Farmer*, an assault with intent to rob was held, at page 217, "sufficient to justify the triers of the facts in determining beyond a reasonable doubt that the action of the defendant at the time of * * * [an] altercation was action taken to carry out that intent and therefore amounted to an attempt to perpetrate robbery." In this case, Reaves committed no assault, and the question arises as to whether his acts nevertheless amounted to an attempt to rob.

American courts have generally agreed that intent to commit a crime does not of itself constitute an attempt, nor does mere preparation. The difficulty is to formulate a standard that excludes preparations prior to an actual attempt to commit a crime, while including, as punishable, those acts which are so dangerously close to resulting in

a crime that intervention and arrest by the police are justified, even before the "last proximate act." Various tests have been suggested and followed in other jurisdictions. There is a good discussion of this problem and the various approaches in Wechsler, Jones and Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy. 61 Columbia L. Rev. 571, 573-621. It is not necessary to consider each of the alternative approaches here. Ohio's statutory definitions of criminal offenses in the Revised Code are based largely upon the American Law Institute's Model Penal Code, and the standard adopted in the latter Code appears to us workable, reasonable, and consistent with the language of R. C. 2923.02(A). Under Section 5.01 of the Model Penal Code, an attempt is when one "purposely does or omits to do anything which is * * * an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." To constitute a "substantial step," the conduct must be "strongly corroborative of the actor's criminal purpose." The application of this standard will of course depend upon both the nature of the intended crime and the facts of the particular case. A substantial step in the commission of a robbery may be quite different from that in arson, rape, or some other crime. But this standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention, based upon observation of such incriminating conduct, in order to prevent the crime when the criminal intent becomes apparent.

Reaves' act of climbing onto the store roof with a gun, apparently to lie in wait for the store manager, was plainly a substantial step in the planned robbery, and certainly was strongly corroborative of the criminal purpose. We find no error in the trial court's holding that this conduct could constitute attempted robbery, or in the verdict of the three-judge panel that the defendant Woods was guilty beyond a reasonable doubt.

There was also sufficient evidence from which to conclude that the defendants had not "completely and voluntarily" renounced their criminal purpose. Abandoning an attempt out of fear that the police might be coming cannot reasonably be considered voluntary. Nor is it clear in this case that the attempt was completely abandoned, for the defendants left the car parked near the store and walked away, behavior from which a jury might properly infer that they intended only to wait at a distance and observe whether the robbery might still be possible despite the siren they had heard.[1] We find no error in the guilty verdict rendered by the three-judge panel.

## III

At the mitigation hearing held following appellant Woods' conviction, the defense argued that his sentence should be reduced to life imprisonment because it was "unlikely that the offense would have been committed, but for the fact that the offender was under duress [or] coercion * * *." R. C. 2929.04.(B)(2). The evidence presented at the trial and the mitigation hearing indicated that Reaves had been the dominant party in initiating, planning, and carrying out the crime. There was also evidence that Reaves had been involved in criminal gang activities in Chicago. According to Woods' testimony, Reaves bragged of his criminal past and owned a sawed-off shotgun with "initials" cut in the stock for men he had killed. Woods did not claim that he was actually threatened by Reaves, but did assert that he was intimidated by him, wished to back out of the planned robbery, and went along with it unwillingly only

---

[1]Cf., Model Penal Code, Section 501(4):

"* * * Within the meaning of this Article, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim."

after Reaves placed the gun in his hands and told him that all he had to do was stay on the sidewalk and watch for the police. Woods testified that he was reluctant to stay, but that he was afraid of what Reaves might do because of his violent reputation, and that when they were walking away he was only going to talk to the policeman, but that Reaves pushed Woods back and started shooting. Woods said that he had shot at the policeman because he was scared. The examining psychiatrist testified that Woods had no prior record and had been an outstanding athlete in high school. The psychiatrist testified further that Woods was a person ''dependent on other people's opinion and leadership,'' that he ''would not offer much objection to being dominated or controlled,'' and that he probably would not have committed the crime if he had not been under duress, coercion, or strong provocation. Woods' parents also testified on his behalf.[2]

The question is whether this evidence was sufficient to justify mitigation of sentence. R. C. 2929.04(B) provides that the death penalty:

''* * * is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a prepondence [sic] of the evidence:

'' * * *

''2. It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.''

This language must be strictly construed against the

[2]One difficulty in considering the claims for mitigation in this case is that the pre-sentence report required to be made by statute does not appear in the record. This court bears a special responsibility in capital cases to assure that the ultimate penalty of death be imposed fairly and consistently, and that responsibility requires that we independently evaluate the evidence of aggravation and mitigation upon which each death sentence is based. For that reason, pre-sentence reports and other information relevant to the appropriateness of the death sentence should properly be included in the record of each case brought to this court as a matter of right because the appellant's sentence of death has been affirmed by the Court of Appeals.

state and liberally construed in favor of the accused. R. C. 2901.04(A).

In construing and applying the words "duress" and "coercion," we must note first that those terms would be a virtual nullity if they were taken to apply to the legal standard for duress as a defense to a criminal charge.

In the case of the most common type of aggravated murder, purposely causing death in connection with certain felonies, if the defendant has a valid defense of duress to the underlying crime, he can, at most, be convicted of the murder itself, not of aggravated murder, and he would not then be subject to the death penalty.[3] Accordingly, to have any effective meaning, the terms "duress" and "coercion" in R. C. 2929.04(B) must be construed, if possible, more broadly than when used as a defense in criminal cases. This is particularly true since the defendant is required to establish duress or coercion by a preponderance of the evidence for purposes of mitigation, whereas during trial he is required only to present evidence sufficient to raise such an affirmative defense, and the burden of disproving it beyond a reasonable doubt remains with the prosecution. *State* v. *Robinson* (1976), 47 Ohio St. 2d 103, 351 N. E. 2d 88.

The concepts of duress and coercion are also found in civil law and have broader meaning. The application of those concepts varies greatly, and turns largely upon the circumstances of each individual case, including the character of the one sought to be influenced. As this court held in *Tallmadge* v. *Robinson* (1952), 158 Ohio St. 333, 109 N. E. 2d 496, paragraph two of the syllabus:

"In determining whether a course of conduct results in

---

[3]There is strong precedent for holding that duress is not a defense to murder, but that question has not been decided in Ohio. At common law, no person can excuse himself for taking the life of an innocent person on the grounds of duress. *Arp* v. *State* (1893), 97 Ala. 5, 12 So. 301; *Watson* v. *State* (1951), 212 Miss. 788, 55 So. 2d 441; *State* v. *Weston* (1923), 109 Ore. 19, 219 P. 180; *State* v. *Nargashian* (1904), 26 R. I. 299, 58 A. 953; *Leach* v. *State* (1897), 99 Tenn. 584, 42 S. W. 195. This rule has been modified by statute in some states. *Jones* v. *State* (1950), 207 Ga. 379, 62 S. E. 2d 187; *Paris* v. *State* (1895), 35 Tex. Crim. 82, 31 S. W. 855.

duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered.''

Duress usually connotes some degree of force or threat of force, but duress has also been found when the conduct of one person induces another to enter into a contract against his own volition or judgment, generally out of fear, but also in some cases because of extreme persuasion or pressure of circumstances. 13 Williston on Contracts (3 Ed.), Section 1608. Coercion is generally defined more broadly to include undue influence and other lesser forms of compulsion. It has been said that:

''The words 'coercion' and 'duress' are not synonymous, although their meanings often shade into one another. 'Duress' generally carries the idea of compulsion, either by means of actual physical force or threatened physical force applied to the person (or to some near relative of the person) to be influenced, or applied to the property or reputation of such person. 'Coercion' may include a compulsion brought about by moral force or in some other manner with or without physical force.'' *McKenzie-Hague Co.* v. *Carbide & Carbon Chemicals Corp.* (C. A. 8, 1934), 73 F. 2d 78, 82. Coercion has been found in a wife's refusal to return to her husband and resume marital relations (*Campbell* v. *Prater* [1948], 64 Wyo. 293, 191 P. 2d 160), and in an employer's warning to striking workers that if they did not return to work by a certain day their jobs would be filled (*N. L. R. B.* v. *Montgomery Ward & Co.* [C. A. 9, 1943], 133 F. 2d 676).

These judicial definitions of coercion correspond to the common use of the word. Webster's Third New International Dictionary defines coercion as ''the act of coercing: use of physical or moral force to compel to act or assent,'' and to coerce as ''to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).''

The essential characteristic of coercion which emerges from these definitions is that force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the defendant so that he acted other than he ordinarily would have acted in the absence of those influences.

This definition appropriately allows consideration of the broad range of information relevant to mitigation set out in R. C. 2929.04, including "the nature and circumstances of the offense and the history, character, and condition of the offender." It also corresponds, as well perhaps as any definition, to the essential purpose of any hearing upon mitigation. The question at that stage is not guilt, for guilt has already been determined. Nor is it primarily whether the standards of conduct imposed by the criminal law have been upheld in order to express society's disapproval of the criminal act and to deter others, for those goals too are largely accomplished by the verdict. Rather, the purpose of mitigation is to recognize that the punishment assigned for a criminal act may, for ethical and humanitarian reasons, be tempered out of consideration of the individual offender and his crime. As the United States Supreme Court has said: "* * * The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions * * *." *Williams* v. *New York* (1949), 337 U. S. 241, 247.

Construing R. C. 2929.04(B) liberally in favor of the accused, we think that the standard stated is appropriate for the trial judge or judges to apply to the facts presented at the mitigation hearing, including the nature and circumstances of the offense and the history, character and condition of the defendant, in making the determination of whether a sentence of death should be reduced to life imprisonment because of duress or coercion.

In the present case, the evidence establishes a con-

sistent portrait of Woods as a young man with no previous criminal record but one who was easily led and who came under the influence of Reaves, the brother of the woman he was living with. It appears likely that it was the influence of Reaves which persuaded Woods to agree to participate in a robbery, to acquiese and cooperate in the purchase of the gun, and to remain at the scene of the attempted robbery despite his reluctance. All of these are factors which favor the granting of mitigation. Yet the hard fact remains that when the opportunity to abandon the robbery, to surrender to the police, to flee, or even to refrain from firing, was presented, Woods nevertheless opened fire on the wounded officer, despite the fact that Woods was not ordered or even urged to do so. In committing that act, for which punishment under law must now be set, defendant Woods was under neither coercion nor duress, and we can accordingly find no grounds for reducing the sentence of death imposed upon him.

## IV

The judgments of the Court of Appeals in 76-155, *State* v. *Reaves*, and 76-137, *State* v. *Woods*, are affirmed.

*Judgments affirmed.*

O'NEILL, C. J., HERBERT, CORRIGAN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.