DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
_________________________________ BAIRD, Presiding Judge.
Brian Gisentaner was convicted of robbery, for violating R.C.2911.02(A) (2). He has timely appealed his conviction.
Gisentaner has assigned as error that (1) a rebuttal witness, who had been present in the court during other testimony, was permitted to testify despite a motion for separation of witnesses and (2) his conviction was against the manifest weight of the evidence.[1] Both assignments of error are overruled.
 I
At the trial, Jashawn Russell, the victim, testified that as he was walking home on May 12, 1998, he passed a group of four young men, including Gisentaner. Russell knew two individuals in the group: Anthony Johnson, whose sister he had previously dated, and Mark Wilson, who was Johnson's brother or stepbrother.
A short distance later, Johnson began verbally taunting Russell. The confrontation became physical, and the two of them dropped to the ground fighting, with Russell sitting on top of Johnson. Russell testified that the three others then rode up on their bikes, got off, and started hitting and kicking him. He specifically identified Gisentaner as one of the individuals who kicked and punched him. Mark Wilson began hitting him in the neck and head with a plastic golf club. At that point, Russell curled up in a ball on the ground and covered his face with his hands to protect himself. Russell said that Johnson instructed the others to check his pockets. He testified that they took $25 and his pager.[2] In response to a question from Johnson about whether they got it, Russell asserted that he heard Gisentaner and Wilson both respond, "Yeah, we got it." Russell could not identify which individual actually took the pager from him, or which one took the $25.
Next, according to Russell, Wilson gave Gisentaner the toy golf club and the two of them got into a fight. While Wilson and Gisentaner were focused on each other, Russell "yanked away from Anthony Johnson" ripping his shirt in the process, and ran up the street. Russell testified that as he ran away Gisentaner ran after him and hit him with the club. Russell then escaped by running into one of the houses on the street.
As a result of this incident, Russell testified that the injuries he sustained were a "[b]ruised spinal cord, back of my neck was bruised, and knots on my head." He was examined at a hospital, and was unable to work for two days.
Brian Wilson testified that only he, Johnson, and Gisentaner were together that day, before encountering Russell. He stated that when the altercation began, Johnson told Gisentaner to hold the bike on which both Wilson and Johnson had been riding. Gisentaner did so, and Wilson got off the handlebars and held Gisentaner's bike. Gisentaner continued to hold the bikes and to observe during the entire fight. Wilson testified that while Johnson and Russell were struggling on the ground, Johnson was on top of Russell. When Wilson went to grab Johnson, to stop the fight, he "guess[ed Russell] just got up and he punched me in the back of my head." When Russell tried to run away, Wilson tripped him with the club then hit him once in the back with the club. Wilson testified that after he used the club on Russell he threw it down, and Gisentaner never picked it up. According to Wilson, Russell got up and tried to run away again and Johnson caught him again and beat him some more. In the process of freeing himself, some change and the pager fell to the ground and "he just kept running[.]"
Wilson testified that someone had picked the pager up from the ground before he left the scene, but was evasive about who had picked it up. Gisentaner testified, telling essentially the same version of events that Wilson told.
The officer who had responded to the initial call testified that Russell had identified Johnson and Wilson as two of his attackers and described a young black male in "all red" as one of the individuals who had beaten him. Based on information obtained from questioning Johnson, the investigating officer tentatively identified Gisentaner as being involved. He put together a photo array containing a photo of Gisentaner, and photos of five other similar individuals. The next day, Russell identified Gisentaner from the photo array. Gisentaner testified that he was wearing a red jogging suit that day.
Gisentaner testified that once he was arrested for robbery of the pager, he found out where it was so that he could give it back to Russell. When asked who had it, and how they came to have it, he testified:
 Q: And it was one of the guys you were with who had the pager:
A: Somebody had the pager.
Q: Was it one of the guys you were with?
A: Yeah.
Q: Who had the pager?
 A: It was — it was — it fell off in the street and somebody picked it up. I mean, who had the pager, Anthony had the pager. It was in the street. It was picked up. It wasn't — it was — it was put — it was like —
THE COURT: Excuse me. Just try to answer the question.
Q: Anthony had the pager?
A: Not in his possession, but he knew where it was.
Wilson testified that he accompanied Gisentaner when he tried to return the pager. Wilson said that Gisentaner did not have the pager, but he "guess[ed] he knew who had it."
Russell confirmed that approximately two and a half weeks after the incident, once Gisentaner had been arrested and released on bond, he was contacted by Gisentaner. He testified that he and his identical twin brother were standing outside their house when Gisentaner, Wilson, and a third individual pulled up in a car and Gisentaner exchanged words with Russell about returning the pager and dropping the case.
Russell's grandmother, Ethel Tyler, testified as to a later encounter between Gisentaner and Russell's twin brother Dashawn. Dashawn and a couple of cousins were sitting in a car that was parked in front of her house when another car pulled up beside it. In response to shouting and cursing, she went over to investigate. She identified Gisentaner as the passenger side occupant of the car, and described him as shouting and threatening Dashawn, whom he apparently had mistaken for Russell. She noted that Gisentaner's big black dog, which was in the car, "jumped toward wanting to get out."
Although Gisentaner admitted that the second encounter took place, he denied that he was threatening during either encounter. He asserted that he used his dog defensively against Russell's cousins who were threatening him.
 II Separation of witnesses. The Ohio Rules of Evidence provide that, "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses[.]" Evid.R. 615.
Gisentaner has contended that, "Appellant's counsel made an attempt to make a motion for separation of witnesses * * * [which] the trial court overruled * * * before counsel could finish making it." Immediately prior to Ethel Tyler's rebuttal testimony, the last testimony offered by either side, the following exchange occurred:
 MR. KERNAN: Your Honor, I'm going to object to this witness at this time. It's my understanding that —
THE COURT: Overruled.
Because, by its language, the evidentiary rule is designed to prevent witnesses from hearing the testimony of other witnesses, a motion to separate witnesses must be made prior to the testimony the party wishes to prevent being heard. Gisentaner sat through testimony from all five other witnesses in the case before he attempted to make what he characterizes as a motion to separate witnesses. In the absence of a motion from Gisentaner, followed by an order from the court to exclude her, Tyler was free to be present in the courtroom during the testimony of other witnesses. Her presence created no barrier to her later testimony. Gisentaner's first assignment of error is overruled.
 Manifest Weight of the Evidence The Ohio Supreme Court has noted that "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. In determining whether this is one of those exceptional cases, we review the entire record, consider the credibility of the witnesses, weigh all the evidence, and make all reasonable inferences. Angus v. Ventura (January 27, 1999), Medina App. No. 2740-M, unreported at 5. To sustain Gisentaner's assignment of error this court must find, in resolving conflicts in the evidence, that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Id.
In order to establish that Gisentaner committed a robbery, the state was required to prove, beyond a reasonable doubt, that "in attempting or committing a theft offense or in fleeing immediately after the attempt or offense * * * [he i]nflict[ed], attempt[ed] to inflict, or threaten[ed] to inflict physical harm on another[.] R.C. 2911.02(A) (2). Theft offenses include knowingly obtaining the property of another without their consent for the purpose of depriving him of that property. See R.C.2913.02. Attempt is a purposeful omission or commission, which constitutes a substantial step in a course of conduct that is intended to result in the commission of the crime. State v.Woods (1976), 48 Ohio St.2d 127, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 910,57 L.Ed.2d 1153.
In this case, both parties agree that Gisentaner was present during the altercation. Neither party disputes that physical harm was inflicted on Russell by one or more of the individuals he encountered on May 12, 1998. Both parties agree that after the altercation Gisentaner had possession of, or access to Russell's pager. They disagree over (1) whether Gisentaner participated in inflicting physical harm on Russell and (2) whether he knowingly obtained, or attempted to obtain, the pager and or money from Russell with the intent to deprive him of it.
Shortly after the incident Russell identified two of the four individuals involved, and described a third attacker as wearing "all red." The next day, Russell correctly identified Gisentaner, an individual he had never met before the incident, from a photo array. Gisentaner admits being present that day and wearing a red jogging suit. Russell testified in court that Gisentaner hit and kicked him, and that later as he was attempting to escape Gisentaner hit him with the toy golf club.
In contrast, Gisentaner testified that he stood apart from the fight between two of his friends and Russell and held the bikes on which he and his friends had been riding. Wilson supported Gisentaner's version, and indicated that Gisentaner never had the golf club in his hands.
With respect to the theft offense, Russell testified that Johnson asked Wilson and Gisentaner if they got it, apparently referring to his money and pager, and that he heard both reply that they had. He could not identify specifically which individual took the pager, and there were slight variations in his descriptions of how the pager and money were taken from him.
Gisentaner did have possession of, or control over, the pager at some later time. After his arrest for robbery, Gisentaner offered to return it to Russell. In his testimony about the pager, a portion of which is recited above, he denied taking the pager but was evasive about how the pager left the scene and who had possession of it. Wilson was equally evasive in his testimony. Russell confirmed that Gisentaner directly contacted him a couple of weeks after the event about dropping the charges and about returning the pager.
Russell's grandmother did not see the incident for which Gisentaner was charged, or the second contact between Gisentaner and Russell. She was present, however, for an exchange between Gisentaner and another grandson. She testified that when she responded to angry shouting from the front of her house she witnessed an incident in which Gisentaner pulled up beside the car in which Dashawn, Russell's identical twin, was sitting. She described Gisentaner as acting in a verbally and physically threatening manner toward Dashawn, whom he apparently mistook for Russell. Gisentaner contended that he had only attempted to protect himself from Russell's cousins by keeping his dog at his side, and was not threatening toward Dashawn.
Russell's testimony, if believed, would establish that Gisentaner inflicted physical harm on Russell. Russell's testimony as to Gisentaner's admission that "We got it," supports a finding that Gisentaner deliberately took the pager, the money, or both from Russell. Gisentaner's evasiveness in answering questions about the pager and his offer, and apparent ability, to return the pager to Russell once he was arrested for robbery support a finding that Gisentaner took the pager, or was involved in its theft to the extent that his participation constituted a criminal attempt.
Russell's description of the outfit Gisentaner was wearing and his subsequent identification of him from a photo array lend credence to the accuracy of his perceptions of the event. Gisentaner's evasiveness about the pager, coupled with his apparent ability to produce the pager undercuts his credibility. Wilson's evasiveness as to who had the pager, and how it left the scene, similarly diminishes his credibility. The contrasting descriptions by Gisentaner and Russell's grandmother of a later altercation provide yet another opportunity to evaluate Gisentaner's credibility.
In a jury trial, the resolution of conflicting testimony is a matter entrusted to the jury. After observing all the witnesses, listening to their differing testimony, and judging their credibility, the jury apparently chose to believe Russell. That choice was not against the manifest weight of the evidence. Because the finding by the jury that Gisentaner committed robbery was not against the manifest weight of the evidence, his second assignment of error is overruled.
 III
Gisentaner's first assignment of error is overruled, because his failure to move for separation of witnesses at time when an order for such separation would have been effective precludes his argument that a rebuttal witness should have been prevented from testifying. We overrule his second assignment of error, because the decision by the jury to convict Gisentaner of robbery was not against the manifest weight of the evidence. The judgment of the trial court is affirmed.
Judgment affirmed.
 KK The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellant.
 Exceptions. ___________________________ WILLIAM R. BAIRD FOR THE COURT
SLABY, J.
WHITMORE, J.
CONCUR
[1] The assignments of error have been reversed, so that this court's review of whether specific testimony should have been permitted is completed prior to our review of the manifest weight of the evidence.
[2] On direct examination, Russell testified that "it" fell out. It is unclear whether it refers to the pager, the pager clip, the money, or all three. On cross examination, Russell testified that they pulled the pager off leaving the clip attached to his pants, and that they pulled his pockets out to get the money out.