OPINION
Paul Phillips appeals from his conviction in the Montgomery County Common Pleas Court of conspiracy to commit aggravated murder after a jury trial.
The target of the alleged conspiracy was Sheila Phillips, the spouse of the appellant. The Phillips were married in 1969 and lived in the City of Dayton with their son Mark and his girlfriend and their three children.
The Phillips separated in October 1997 after Jan Maue called Sheila telling her she was appellant's girlfriend. Appellant reconciled with Sheila and moved home in late November 1997.
In early February, 1998, Jan Maue began making a number of phone calls to Sheila from various locations and Sheila's efforts to have the telephone company block those calls was fruitless. (Tr. 167). As a result, and because Sheila was concerned about Mark's drug problem, Sheila and her daughter Paula decided to obtain a telephone call recorder from the electronics company where Paula worked. (Tr. 168; Exhibit 1). Around February 20 or 21, 1998, Sheila hooked up the recorder to the telephone in the basement so her son would not find it. (Tr. 169).
On February 28, 1998, Patricia Clendenon called and asked Sheila if she would like to go out that night to get a pizza and see the movie "Titanic." (Tr. 177-8). Sheila accepted, told her husband, and went with Patricia to Marion's Pizza and then to the Beavercreek Cinema. (Tr. 183-186).
Appellant stayed home with his friend, Art O'Neil. (Tr. 425). While there, appellant talked with O'Neil about how he still loved Jan Maue and how he wanted to be with her. (Tr. 427, 429). He also spoke to O'Neil about how he wanted to kill Sheila in order for him to be with Maue. (Tr. 429-30).
While Sheila was still at the movies, appellant called another friend, Timothy Wagoner at least two times. Appellant had talked to Wagoner in the past about killing Sheila. He had told Wagoner that Maue was his girlfriend and that she had called his house and gotten him in trouble with Sheila. He told Wagoner that he would lose everything if he did not do something about it.
Appellant told Wagoner that he planned to get an eighteen shot, .22 caliber rifle from Wagoner to shoot Sheila. Appellant's plan was to kill her that night while she was at the movies or, in the alternative, at a restaurant called Joe Margaret's later that evening. If the killing was to take place at the movie theater, Wagoner testified that Phillips wanted him to be his alibi or he was to be the shooter. If the killing was to take place at Joe Margaret's restaurant, appellant's plan was to have O'Neil be the shooter. Appellant had told both Wagoner and O'Neil that if it occurred at the restaurant, it could be made to look like a robbery.
In appellant's first telephone call to Wagoner, appellant asked Wagoner if "everything was ready up there" to which Wagoner replied that it was. (Exhibit 3). Appellant said something to Wagoner on the phone about "getting rid of that trash" which Wagoner testified considered a reference to appellant's desire to kill Sheila. (Tr. 383). Appellant told Wagoner that he would call him back in an hour or so. (Exhibit 3).
In appellant's second call to Wagoner that night, appellant told Wagoner that Sheila was at the movies and he discussed his desire to shoot her there. (Exhibit 3). He discussed the possibility of shooting Patricia as well as three or four other people to distract any investigation into the murder. Wagoner told appellant that would not be a good idea because it might attract too much attention. Wagoner testified that he agreed with appellant to go along with his plan to kill Sheila, although he claimed that he never really intended to go through with it. (Tr. 415).
After speaking with Wagoner, appellant and O'Neil drove to the Beavercreek Cinema to find Sheila's car and survey the area. (Tr. 427-9). A couple of days before, appellant had told O'Neill that he wanted to kill his wife. (Tr. 432). On the way there, they talked about appellant's plan and how appellant wanted O'Neil to do the shooting. (Tr. 429-30, 432). Upon arrival at the theater, they found Sheila's car and drove around the parking lot for five minutes or more. (Tr. 430, 438). Appellant told O'Neil that he thought it was too busy of an area, and that they should do the killing at Joe Margaret's restaurant, with O'Neil killing Sheila during a fake robbery. (Tr. 443-4, 457-8). Appellant told O'Neil how the entire robbery should take place and he told him that he would supply O'Neil with the gun. He also told O'Neil where he could hide the gun after killing Sheila. (Tr. 444-5). O'Neil testified that he never agreed to go along with appellant's plan. (Tr. 444, 460-1). However, O'Neil testified that he sat and listened to appellant's plan without saying anything for about five or ten minutes before he claimed to have told appellant that he would not participate.
After leaving the theater, appellant and O'Neil drove to Wagoner's house. (Tr. 439). Wagoner testified that appellant believed Wagoner had agreed to go along with the plan because he showed up there. (Tr. 416). Appellant and Wagoner went into a room separate from O'Neil to look at the .22 caliber rifle that appellant intended to get from Wagoner in a trade for a .22 caliber pistol. (Tr. 395, 442). While in that room, appellant told Wagoner that he did not think O'Neil had the nerve to go along with his plan. (Tr. 396-7). Appellant wanted to know what time the movie got out so he asked a child visiting one of Wagoner's children to call the theater and find out. (Tr. 397). The child called and told him when the movie let out. Appellant then asked Wagoner to go with him to the theater to kill Sheila right then. (Tr 396). Wagoner finally said "No." Appellant and O'Neil left Wagoner's house saying that they were going to Beavercreek. (Tr. 397). When they left, Wagoner claims that he called 911 to report appellant's car as that of a drunk driver in order for the police to stop them. (Tr. 397-8). Appellant drove O'Neil back to Burkhardt Avenue without being stopped by police. (Tr. 443).
The movie got out after 10:00 p.m. and Sheila got back to the Burkhardt Avenue house some time before 11:00 p.m. (Tr. 186). Upon her arrival at home, appellant and O'Neil were at the house. (Tr. 185). Appellant told Sheila he wanted her to go with him and O'Neil to cash a check, get something to eat, and take O'Neil home. (Tr. 187). Sheila, tired and not hungry, said she was not interested, but appellant insisted that she go with them. It was very unusual for them to go out this late on a Saturday night. (Tr. 188). Still, Sheila reluctantly agreed to go along. They all got in Sheila's car and, as appellant backed it out of the driveway, appellant said to O'Neil that they would not do it now, that they would just take O'Neil straight home and that they would do it later. (Tr. 189, 462). While this discussion made no sense to Sheila, O'Neil said, "Yeah. Later." (Tr. 189-90, 462). Appellant then drove to O'Neil's house and dropped him off. (Tr. 190). On the way back from O'Neil's house, appellant drove Sheila by Joe Margaret's restaurant very slowly, peering into the parking lot. (Tr. 190). Sheila asked if he was looking for anyone in particular, but he said that he was just looking to see who was there. (Tr. 191).
The next day, appellant and Sheila went to dinner in Springfield, Ohio, at Sheila's sister's house. (Tr. 191-2). While there, appellant seemed oddly interested in Sheila's sister's address and security system. Upon their return to Burkhardt Avenue, Vicki informed Sheila that she was worried about Mark because he had not come home the night before. (Tr. 192-3). Vicki told Sheila that Mark had received a telephone call Saturday night and left the house shortly afterward. (Tr. 193). Sheila asked Vicki if the recorder was on and Sheila went into the basement to check. When Sheila listened to the tape, at around 7:00 p.m. Sunday night, she heard appellant's conversations with Wagoner in which the two men plotted to kill her. (Tr. 195; Exhibit 3). She brought Vicki down to listen to the tape, and Vicki took the tape and her children and left the house. (Tr. 200-02). Sheila remained at the house and confronted appellant, who, after the initial shock of finding out that he was taped, claimed that it was all a joke between him and Wagoner. (Tr. 204, 238-9). Both Wagoner and O'Neil testified that neither one then considered it a joke. (Tr. 402, 434). As a result of her discovery of the tape, Sheila told appellant that she was going to leave, but appellant threatened her and would not let her go. (Tr. 207-8). Because Sheila's niece, Tricia Winthowski, arrived at the house unexpectedly, Sheila was able to leave and the police were eventually called. (Tr. 206-8, 211-12, 275).
Sheila signed a consent form allowing the police to enter and search the house. The search of the house resulted in the discovery of the tape recorder, two knives, and a plastic bag contained a disassembled nine millimeter handgun, several rounds of ammunition and a holster. (Tr. 221-2, 317, 349, 351). There was testimony that the handgun was capable of being made operable by reassembling it, although no one tested it for operability. (Tr. 230, 326-7, 353). Mark testified that it was broken, but he did not testify if that meant broken down, inoperable or both. (Tr. 298). He testified that the knives and gun were appellant's and that appellant carried a .22 pistol in his car with him on occasion. (Tr. 294-6). The .22 caliber pistol was never found, but police did see the eighteen shot .22 caliber rifle at Wagoner's house. (Tr. 452). In an interview with Detective Doyle Burke, appellant denied any intent to harm his wife. Appellant stated "I was just acting stupid, and I had been drinking." (Tr. 451).
The Montgomery County Grand Jury indicted Phillips upon one count of conspiracy to commit aggravated murder and one count of soliciting another to commit aggravated murder.
Each count contained a firearm specification. Appellant moved for acquittal at the conclusion of the State's case-in-chief. The trial court granted the motion as to the two gun specifications and the one count of complicity, but denied the motion as to the one count of conspiracy. Appellant put on no evidence in his defense but made a renewed motion for acquittal on the remaining conspiracy count after he rested. The trial court denied that motion as well.
The indictment specified the following substantial overt acts were done in furtherance of the conspiracy by the appellant or by a person with whom he conspired, to wit:
 Defendant contacted potential hitmen to notify said hitmen to commit the homicide at the movie theater where the victim had gone with a friend; defendant surveyed the movie theater parking lot which was the intended scene of the homicide; defendant sought to obtain the weapon to commit the homicide; defendant also devised an alternate plan to kill the victim which was to be completed by shooting her during a fake robbery; defendant lured the victim out of the house to the location where the "robbery" was to take place. (Emphasis ours).
In his first assignment of error, appellant contends the trial court erred in not granting his Crim.R. 29 motion which he made at the conclusion of the State's case-in-chief.
Crim.R. 29 provides that the trial court, upon motion by a defendant after the evidence on either side is closed, shall order the entry of a judgment of acquittal of the offense charged in the indictment if the evidence is insufficient to sustain a conviction of the offense. The state is required to prove all the elements of the crime beyond a reasonable doubt, including those elements relating to the body or the substance of the crime and the act and criminal agency of the act. A court shall not render a judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v.Bridgeman (1978), 55 Ohio St.2d 261.
R.C. 2923.01(A) provides that no person, with purpose to commit the commission of aggravated murder . . . shall do either
of the following:
 (1) with another person or persons, plan or aid in planning the commission of any of the specified offenses (listed in R.C. 2923.01(A)). (2) agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
R.C. 2923.01(B) provides:
 (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed. (Emphasis added).
Appellant argues the state failed to prove a prima facie case because the record demonstrates there was no agreement between the defendant and Art O'Neil and Tim Wagoner to kill the defendant's wife. Appellant argues that the record demonstrates that no money was exchanged, and no guns or weapons were purchased to accomplish the crime.
Appellant also notes that Tim Wagoner testified that appellant never specifically asked him to kill his wife, but talked about "getting rid of his wife." (Tr. 370). Appellant notes the record demonstrates that O'Neil and Wagoner never even "pretended" to go along with the defendant's alleged plan. Lastly, appellant argues that the State failed to prove that a substantial overt act was committed in furtherance of the alleged conspiracy.
We have listened to the tape recordings of the defendant's conversations with Art O'Neill and Timothy Wagoner. We are satisfied that a reasonable jury could conclude beyond a reasonable doubt that the defendant intended to kill his wife and that he had reached an agreement with O'Neil and Wagoner to assist him in that endeavor. Wagoner himself testified that he agreed to go along with the defendant's plan to kill his wife, although he claimed that he never really intended to go through with the plan.
In State v. Marian (1980), 62 Ohio St.2d 250, the Ohio Supreme Court held that a person is guilty of conspiracy under R.C. 2923.01 even though the other person feigns agreement and at no time intends to go through with the plan. Chief Justice Celebrezze noted at pages 254 and 255 of the Court's opinion:
 The acts and intent of the unilateral conspirator are identical to those of the conspirator who is part of a group where an actual meeting of the minds exist. The unilateral conspirator's culpability is the same as the participant in a more traditional conspiracy. This is in contrast to the person guilty of an attempt; he has not acted in the same manner as the man actually guilty of the crime. Consequently, once it is decided that participation in unlawful group conduct is the proper subject of a criminal offense even in the absence of a meeting of the minds, it becomes proper to make such participation a conspiracy even though it may be inchoate in nature. The unilateral approach is properly a part of our criminal justice system. This is particularly true when the legislature has recognized and dealt with the inchoate nature of unilateral conspiracies. R.C. 2923.01(B) requires that there be a substantial overt act, insuring that purely a state of mind is not punishable. R.C. 2923.01(G) merges the conspiracy offense, due to its inchoate nature, into the substantive offenses which are the object of the conspiracy. In addition, the legislature has not provided a separate provision for the highly inchoate solicitation offense.
A few state legislatures, like Ohio, have adopted overt act requirements which involve more substantial acts than the other formulations of the requirements. Few cases have raised the problem of the substantial nature of the overt act, as in most cases the prosecution can, and usually does prove very substantial overt acts — so substantial in fact, that the overt acts pleaded and proved are very often the substantive attempt counts being treated at the same time as the conspiracy count. Marcus, Conspiracy, The Criminal Agreement in Theory and in Practice, 65 Geo. L.J. 925,936 (1977).
It is important to note that the substantial overt act need not be so substantial as to constitute an attempt to commit the target crime. For example, in Ohio, a criminal attempt occurs when one purposely acts or omits to act which act or omission constitutes a "substantial step" in a course of conduct planned to culminate in the commission of the crime. State v. Woods (1976),48 Ohio St.2d 127. Mere preparation is insufficient to constitute an attempt.
A Washington statute requires that an agreement be shown and that the government in addition prove that one of the conspirators "takes a substantial step in pursuance of such agreement." Wash. Rev. Code § 9A.28.040. The statute does not define "substantial step" but the court in State v. Dent, 869 P.2d 392 (Wash. 1994), concluded that the requirement was not such as needed under the attempt statute (which also used the substantial step language). Instead, the substantial step requirement is similar to the overt act element in the federal conspiracy law.
 We agree that the conspiracy statute requires a lesser act than does the attempt statute. We are particularly persuaded by the fact that RCW 9A.28.040
requires only an act that is a "substantial step in pursuance of [the] agreement" as opposed to a "substantial step toward the commission of [the] crime." RCW 9A.28.020. We hold that preparatory conduct which furthers the ability of the conspirators to carry out the agreement can be "a substantial step in pursuance of [the] agreement." Therefore, we hold that the trial court properly refused to instruct the jury that the "substantial step" element of a conspiracy requires more than mere preparation. 869 P.2d at 398.
We agree that the "substantial overt act" required to prove conspiracy may in fact be a preparatory act. In State v. Gordon
(April 20, 1989) Cuyahoga App. No. 55192, unreported, the court of appeals held that in a prosecution for conspiracy to commit aggravated murder, that the delivery of photographs, a description of the victim's vehicle, and an offer to pay $4,000 at some later date to a feigned co-conspirator, were substantial overt acts in furtherance of the conspiracy.
In State v. Butler (October 7, 1985) Stark App. No. CA-6672, unreported, the court of appeals held that the act of the conspirators traveling to a motel in furtherance of providing sex for hire was a substantial overt act in furtherance of that conspiracy.
In State v. Young (April 10, 1990), Montgomery App. No. 11330, unreported, this court held that providing a co-conspirator with a piece of paper describing targeted properties and their addresses and the act of a co-conspirator transporting another conspirator to examine the properties were sufficient substantial overt acts in furtherance of a conspiracy to commit aggravated arson.
In this case, there was evidence presented that after Wagoner's feigned agreement with the defendant to kill defendant's wife, the defendant, while his wife was viewing a long movie, drove to the movie parking lot with O'Neil to determine whether the killing could be accomplished there before going to Wagoner's home to get his rifle.
We believe this evidence was sufficient to prove the substantial overt act alleged in the indictment, that is, the acts manifested a purpose on the part of the defendant that the killing of his wife should be completed. The first assignment of error is overruled.
In his second assignment, Phillips contends his conviction was against the manifest weight of the evidence.
When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.State v. Thompkins (1997), 78 Ohio St.3d 380 at 387. Adopting the language set out in State v. Martin (1983), 2 Ohio App.3d 172,175.
We have carefully reviewed the testimony and the tape recording of the defendant's phone conversations. We do not find that the evidence weighs heavily against defendant's conviction. The second assignment of error is overruled.
In his third assignment, appellant contends the trial court erred in allowing into evidence an inoperable handgun which had no ascertainable connection to the charge of conspiracy to commit murder.
Appellant argues that the admission into evidence of the inoperable nine millimeter handgun unfairly bolstered the State's case even though there was absolutely no testimony connecting the handgun to any unlawful activity on appellant's part.
The State argues that the handgun was relevant because its presence in defendant's house demonstrated he had the ability to carry out his plan to kill his wife. The State also makes the following argument:
 Also, the recovery of the nine millimeter handgun is relevant to the existence and location of the .22 caliber pistol that Appellant was supposed to trade for Wagoner's rifle. If the nine millimeter handgun was the only gun at home, then the .22 caliber pistol could have been with Appellant when he went to the Beavercreek Cinema and to Joe Margaret's restaurant. It also supports the contention that Appellant was sufficiently familiar with handguns to execute his plan and to discuss with Wagoner how alcohol can be used to remove powder stains from a shooter's skin. For any of these reasons, this evidence was relevant, and the trial court did not err.
The admission of evidence under Evid.R. 401 is a matter committed to the sound discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173.
It is true that there was no objection to testimony concerning the 9 millimeter handgun during the trial. It is also clear that the handgun bears little relevance to the State's case. Although we find the trial court erred in admitting the handgun, we do not believe its admissibility amounted to prejudicial error. The third assignment of error is overruled.
The judgment of the trial court will be Affirmed.
FAIN, J., and YOUNG, J., concur.
Copies mailed to:
John J. Amarante
Frank A. Malocu
Hon. David Gowdown