JOURNAL ENTRY AND OPINION
This is an appeal by Octavious (aka Ortavious) Hood from a conviction on one count of attempted gross sexual imposition, following a bench trial before Judge Brian C. Corrigan. Hood claims it was error, during his cross-examination of the victim, for the judge to refuse him access to a police report containing a statement given by her. We reverse and remand.
From the record we glean the following: Hood and Jelica Drewery cohabited from 1999, on and off, until approximately December, 2000, when she returned home to live with her mother, April Miller. Drewery continued to date Hood until near the end of January, 2001, when, she claimed, she broke off the relationship because Hood would beat her when he was intoxicated.
After 6:00 p.m. on February 2, 2001, Hood met Drewery at a restaurant where she worked and attempted to reconcile. She claimed that, when she asked him to leave, he told her that he was going out drinking and would be waiting in her car when she finished work early the next morning. In an effort to avoid Hood, she left work at 3:30 a.m. on February 3, 2001, one-half hour before her shift would have ended.
When Drewery opened her car door, she found Hood asleep in the back seat. She said he was intoxicated, that he wanted a ride home, and that he refused to exit the vehicle. Given his drunken state, Drewery told a co-worker that she would rather drive him home than provoke an argument.
She drove him to his home at the Longwood Estates in Cleveland, but he refused to get out of her car unless she accompanied him to his apartment. She responded that if he did not leave, she would drive to her home and let him sleep in the car, and started to drive away. She claimed she was persuaded to take him back to Longwood and, once there, reluctantly agreed to accompany him to his apartment, where two of his friends were already present, because he began to threaten her, saying he would punch her, kill her or make it so [she'll] never see [her] daughter again. Hood contended, however, that Drewery was amenable to his meeting her after work, and that the couple uneventfully proceeded to his place after she finished her shift.
When the couple entered the apartment they went to Hood's bedroom where, Drewery stated, he threw her on the bed by the neck and demanded that she have sex with him. She contended that, as she protested and attempted to fight him off, he groped her and tried to get in [her] pants, and that, as she tried to leave, he kept pulling her back to him by grabbing her clothing. She claimed she eventually freed herself, quickly exited the apartment at around 5:00 a.m., and tried to protect herself outside the apartment by talking loudly to attract the attention of neighbors. She alleged that Hood told her to quiet down or someone would call the police. Hood contended that while he and Drewery were in his bedroom, they only sat on his bed and talked about reconciling and that she left at around 5:00 a.m.
At some point after 3:30 a.m., Miller had apparently been alerted by Drewery's co-worker that her daughter had left work with Hood. Miller claimed that she was concerned for her daughter, since Hood was intoxicated and had injured her in the past. Miller, her husband, her brother, and Drewery's five-year-old daughter drove to the Longwood Estates and arrived just when Drewery and Hood were approaching her car.[1] Drewery claimed that Hood punched her uncle and otherwise fought with Miller and her husband. Miller stated that the three attempted to defend Drewery against Hood's hostility, and Hood countered that he was attacked by them because, given his limited financial resources, they disapproved of his association with Drewery. It is undisputed, however, that Miller used a small kitchen knife to stab Hood's left shoulder and inflicted a minor wound.
Later on February 3, 2001, Drewery and Miller went to the Cleveland Police Department, where Drewery filed a criminal complaint against Hood. In a statement taken by Patrolman Donald Robinson, she alleged that an intoxicated Hood refused to leave her car when she attempted to drive home from work, and coerced her into driving him home with threats of killing her and that she would never see her daughter again. The report alleged that Drewery drove Hood home because she was in fear for her life, and similarly only went with him to his apartment out of fear. The report stated that while [Drewery] was at [Hood]'s home, [he] began to ask [her] for sex. [He] then grabbed [her] around the neck and attempted to pull her towards him. [She] stated she didn't want to have sex with (so!!) [sic] he left [her] alone. The report further alleged that he kept grabbing her coat, preventing her from leaving, and that she only left when her mother arrived.
In a written statement given to police on February 5, 2001, Drewery alleged not only the above conduct but also added allegations that Hood had grabbed her and held her by the neck in his bedroom, and tried, unsuccessfully, to get in [her] pants. While Drewery claimed that after the incident her relationship with Hood had completely ended except for a few three-way phone calls set up by a friend, Hood stated that the two had several intimate encounters. Drewery attempted to have her complaint dismissed, but was informed by police personnel that she could not. Based on investigation of these allegations, an arrest warrant was issued for Hood for kidnaping, and he was arrested on April 25, 2001, after being detained by the police for an open container violation.
Hood was charged in Case #405333 with one count of kidnaping, in violation of R.C. 2905.01, a first-degree felony, and one count of gross sexual imposition, in violation of R.C. 2907.05, a felony of the fourth degree. In defense of the case, Hood's lawyer did not request discovery, and the State did not voluntarily provide either the February 3, 2001 report or the February 5, 2001 statement to him. Following a jury waiver, the case was tried to the bench, and the judge found Hood not guilty of either charge as indicted, but guilty of one count of a lesser included offense of attempted gross sexual imposition, a felony of the fifth degree. He later sentenced Hood to one year community control sanctions and adjudicated him a sexual offender, with the registration requirements attendant to that classification.
Hood asserts three assignments of error. We find the first and second assignments of error jointly dispositive, rendering Assignment III moot.[2]
 I.
The Defendant Was Denied His Constitutional Right to a Fair Trial Because of Prosecutorial Misconduct When the Prosecutor Failed to Voluntarily Turn over Obviously Exculpatory Evidence and Suborned False Testimony of the Purported Victim, Causing Substantial Prejudice to Mr. Hood.
 II.
The Court Erred in Failing to Turn over or Provide to Defense Counsel for Inspection the Offense/incident Report Containing the Victim's Exculpatory Statement When it Was Inconsistent with the Victim's Testimony and Was Requested for Use in Cross-examining the Victim.
It is undisputed that the State did not provide, and Hood did not seek in discovery, either Drewery's February 2 police report or February 5 written statement. While the judge permitted Hood to cross-examineher about the written statement she gave, he did not permit him to cross-examine her concerning the police report, which the State used in examining both her and Patrolman Robinson. Hood now claims it was error for the judge to refuse him access to the police report once the state introduced it at trial, and that the state should have provided it to him in any event, as an obviously exculpatory piece of evidence. Since the police report reflects that Hood grabbed Drewery and requested sex in his bedroom on February 3, but let her go once she declined, if he could have used and introduced the report at trial, he urges that there is a reasonable probability that he would not have been found guilty of attempted gross sexual imposition. We agree.
In Brady v. Maryland,[3] the court stated, "the suppression by the prosecution of evidence favorable to an accused upon request violates [Fifth Amendment] due process [rights] where the evidence is material * * * to guilt * * * irrespective of the good faith or bad faith of the prosecution." In United States v. Agurs,[4] the Supreme Court extended the rule of Brady to apply to all obviously exculpatory evidence in the hands of the prosecutor, which "is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," even if there be no general or specific request for such exculpatory evidence.
When reviewing assertions of prosecutorial misconduct in connection with the prosecutor's alleged suppression of evidence, the key issue is whether the evidence suppressed is material. Such evidence is material only if a reasonable probability exists that the result of the trial would have been different had the prosecution disclosed such evidence to the defense.[5] The `reasonable probability' test applies in all cases where the defense alleges that the prosecution improperly suppressed evidence, regardless of whether the defense specifically or generally requested the evidence or made no request for the evidence.[6]
Crim.R. 16(B)(1)(g) provides, in pertinent part: Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies. If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.[7]
Under Crim.R. 16(B)(1)(g), a witness's prior statement is discoverable after the person making the statement has testified only after an in camera inspection by the judge reveals that inconsistencies exist between the witness' trial testimony and prior statement. Then the statement can be used on cross-examination. Pursuant to this rule, the party seeking discovery of the prior statement must request an in camera inspection prior to completion of the cross-examination.[8] The defense attorney should be present and allowed to participate in the in camera inspection.[9] Even though a judge may err by not allowing the defense attorney to participate in the in camera inspection, a case will not be reversed if the reviewing court finds no inconsistencies between the testimony and the written report.[10] The trial court's determination as to whether any inconsistency exists is reviewed under the abuse of discretion standard.[11] An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable.[12]
R.C. 2907.05 defines the crime of gross sexual imposition, in pertinent part, as follows:
 (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 (1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force. In order to find attempted gross sexual imposition, the judge, sitting as the trier of fact, needed to find beyond a reasonable doubt that Hood purposely took a substantial step toward committing the gross sexual imposition.[13]
To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose.[14]
We find a very real possibility that a trier of fact, armed with the inconsistency of Drewery's prior statement, could much more easily entertain reasonable doubt that the grabbing of a person's neck, coupled with a request to engage in sexual activity, would constitute an action strongly corroborative of Hood's purpose to compel sexual contact by force. The defense theory at trial, that these charges were engineered by the domineering influence of April Miller, certainly becomes much more palatable in light of an omission of the mention of any direct sexual contact between Hood and Drewery in her initial complaint to the police, which was given on the same day of the events in question. This conclusion is further strengthened if a trier of fact would choose to believe, as the report indicates, that Hood desisted in his efforts after Drewery declined his proposal. As such, we find a reasonable probability (but by no means a certainty), that, had the report and the inferences available from its lack of an allegation of actual gross sexual imposition been available to the trier of fact, Hood would not have been found guilty of attempted gross sexual imposition. As such, the first assignment of error is sustained.
In the case at bar, the State actually suggested an in camera review of the disputed report to determine if material inconsistencies existed, making the review appropriate. We note that, while defense counsel should actually be permitted to participate in the in camera review per Crim.R. 16(B)(1)(g), Hood never asserted that right at trial, and, as such, has waived it.
The judge, however, never actually ruled that the statement Hood wished to use to cross-examine Drewery was not inconsistent with the later statement he was permitted to use; he merely denied Hood's objection and ruled that the report would not be available to the defense. This ambiguity leaves open the possibility that the judge may have accepted the State's assertion that the report constituted protected work-product information, which is clearly not the law in Ohio.[15] Rather, such documents are discoverable as a matter of public record.[16]
Additionally, while the State correctly directs us to Euclid v. Key,[17]
for the proposition that not all factual omissions from a police report constitute irreconcilable or prejudicial omissions, we must note that Euclid v. Key, actually holds as follows: The holding of this court should not be interpreted to mean that under no circumstances could an omission be an inconsistency. Certain details related to the police may naturally not be brought up on direct examination and some details omitted from a witness statement may naturally crop up for the first time at trial, and it is not appropriate to consider the omission of such details to be `inconsistencies.' However, more material omissions may under the circumstances be fairly construed as inconsistencies.[18]
As such, the judge's ruling to deny Hood access to the police report was arbitrary and unreasonable. The second assignment of error is also sustained.
Conviction reversed and remanded.
It is ordered that the appellant recover from appellee costs herein taxed.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., AND PATRICIA A. BLACKMON, P.J., CONCUR
[1] The five-year-old was apparently the only member of the family who knew where Longwood Estates was.
[2] The assignment states:
 III. The Defendant Was Denied His Constitutional Right to Effective Assistance of Counsel When His Attorney Failed to Request the Discovery of Exculpatory Material from the State. See App.R. 12(A)(1)(c).
[3] (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.
[4] (1976), 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392.
[5] Brady, supra.
[6] Id.
[7] See also, State v. Scudder (1994) 71 Ohio St.3d 263,623 N.E.2d 524.
[8] State v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264.
[9] State v. Daniels (1982), 1 Ohio St.3d 69, 437 N.E.2d 1186.
[10] Daniels, supra, fn. 3; State v. Wirtz (July 29, 1993), Cuyahoga App. No. 62751, State v. Duncan (April 14, 1994), 1994 Ohio App. LEXIS 1554, Franklin App. No. 93APA11-1524, State v. Jackson (Sept. 17, 1988), Cuyahoga App. No. 52488.
[11] State v. Clay (1972), 29 Ohio App.2d 206, 212, 280 N.E.2d 385.
[12] Blakemore v. Blakemore, supra.
[13] State v. Smith (Jan. 25, 1996), Cuyahoga App. 68745, relying on State v. Henderson (1988), 39 Ohio St.3d 24, 27, 528 N.E.2d 1237, citing State v. Woods (1976), 48 Ohio St.2d 127, 357 N.E.2d 1059 (specifically discussing the crime of rape.)
[14] Woods, supra, paragraph one of the syllabus.
[15] State ex rel Rasul-Bey v. Ononwur (2002), 94 Ohio St.3d 119,2002 Ohio 67, 760 N.E.2d 421. See also Crim.R. 16.
[16] Id.
[17] (Feb. 27, 1997), Cuyahoga App. Nos. 69382, 69383.
[18] Id.