OPINION
{¶ 1} Michael Gentry appeals from his conviction in the Montgomery County Common Pleas Court of felonious assault of a police officer after a bench trial.
 {¶ 2} The facts are set out in the State's brief and are not seriously in contest. The legal effect of those facts are the subject of this appeal.
 {¶ 3} On Friday, September 24, 2004, at approximately 7:00 a.m., Gentry removed all of his clothes, picked up a two-foot metal pipe, and began terrorizing the neighbors on his street in Kettering, Ohio. The first call to 911 operators occurred at 7:06 a.m. The unidentified caller told the operator that a man was outside screaming obscenities and had just broken out the front window of a nearby house. The caller further stated that the man, later identified as Gentry, was "threatening to kill us." (Tr. 9). Shortly thereafter, the caller stated that Gentry was going into other people's houses and a woman could be heard screaming. (Tr. 10). Another call came in to 911 operators at 7:08 a.m., where the caller stated that "somebody just tried to break into the front part of our house, the window's broken . . . [the caller] heard some man screaming, `get out, get out, get out.'" (Tr. 12). Yet another individual phoned 911 at 7:09 a.m., claiming that "there's a man walking around the street . . . and he's yelling obscenities that he's going to kill people." (Tr. 13). One caller observed Gentry "chasing a woman down the street with a stick . . ." (Tr. 23).
 {¶ 4} Officer Jeff Perkins, a twelve-year veteran of the Kettering Police Department, was the first to arrive on the scene. When he exited his marked cruiser, wearing the uniform of the day, he immediately recognized the man he was looking for, as Gentry emerged from a porch without any clothing on, carrying a two-foot long white metal pole. (Tr. 28). Perkins ordered Gentry several times to halt and lay down his weapon, but each time Gentry ignored those orders and continued towards him. (Tr. 29). Perkins noticed there was blood on Gentry's hands and on the pole. Gentry began walking toward Officer Perkins, carrying the metal pole at shoulder height, screaming that Perkins "better shoot me (Gentry), mother f*cker, because I'm going to kill you." (Tr. 28). Gentry was fifteen to twenty feet away from Officer Perkins at the time, approaching steadily when Perkins was forced to use his taser to subdue Gentry without suffering any bodily harm. (Tr. 32). It was not until he had been tased that Gentry finally dropped the metal pole he was carrying. (Tr. 33). During one of the 911 calls, the sound of the metal pole hitting the ground was clearly audible. (Tr. 24-25). Gentry was a mere ten feet away from Perkins when he finally fell to the ground. (Tr. 33).
 {¶ 5} At trial, Officer Perkins was able to identify both Gentry and the metal pipe he was carrying during the incident. (Tr. 45). He also testified that he had not heard the 911 tape until only a few days before trial, and the only information he had received from dispatch regarding the outburst was that a "naked man was saying he was going to kill people . . . the subject had a bat . . . and was breaking windows." (Tr. 46). Perkins described the damage that Gentry had done to the several residences he had attacked. (Tr. 37). He stated, "the rear sliding glass doors were completely shattered. There was blood in the hallway." Id. Perkins further testified about the marks in the walls that the metal pole had left, and that a "glass curio had been shattered." Id. The front living room window had been "shattered out," leaving a large hole. Id.
 {¶ 6} Officer Chris Murray also testified that he observed the metal pipe at the scene, and that the same one was being presented as evidence at trial. (Tr. 54). Thomas Wheeler identified Gentry as the man he saw that morning, and confirmed that he was one of the 911 callers. (Tr. 61). Wheeler described how he witnessed Officer Perkins arrive on the scene, and how he heard Gentry yell at Perkins "go ahead and shoot me, I'm gonna kill you." (Tr. 63). Wheeler went on to testify that he saw Gentry still had the metal pipe in his hands as he approached Perkins, with his arm raised. (Tr. 72-73). Finally, Christine Brownlee testified that she also observed Gentry with the metal pipe in his hand, and heard the threats Gentry made to Perkins. (Tr. 76, 79). Both of these witnesses corroborated the information on the 911 tape with their testimony.
 {¶ 7} In his first assignment, Gentry contends he was denied his Sixth Amendment right to confrontation by the trial court's admission of the 911 tape. Gentry contends the statements made in the 911 tape are "testimonial" statements within the meaning ofCrawford v. Washington, 541 U.S. 36 and thus it was error to admit them. The State argues that the calls were excited utterances which are not "testimonial" and not implicated inCrawford. We agree. The trial court listened to the 911 calls and concluded the calls were excited utterances. We also have listened to them and we reach the same conclusion. We have concluded that 911 calls are not testimonial, and their admission does not violate the accused's confrontation rights as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. See State v. Byrd, 160 Ohio App.3d 538,2005-Ohio-1902. In any event, two of the callers, Thomas Wheeler and Christine Brownlee, testified at trial and were subject to cross-examination. The first assignment of error is Overruled.
 {¶ 8} In his second and third assignments, Gentry contends his conviction was against the manifest weight of the evidence and was based on insufficient evidence as a matter of law.
 {¶ 9} Gentry contends there was insufficient evidence presented by the State that he attempted to cause physical injury to Officer Perkins. He contends that he committed no substantial overt act which demonstrated his intention to harm Officer Perkins. He notes that he threatened many other persons in the fifteen minutes preceding his confrontation with Perkins, but did not act upon those threats. He argues that his threats to kill people should not have been taken literally. The State argues that it presented sufficient evidence to support Gentry's conviction.
 {¶ 10} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine . . . whether the evidence is legally sufficient to support the . . . verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. "When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt." Statev. Fritz, 2005-Ohio-4736, ¶ 10 (citing Thompkins, supra).
 {¶ 11} Pursuant to O.R.C. § 2903.11 (the felonious assault statute), "[n]o person shall knowingly . . . cause or attempt to cause physical harm to another . . . by means of a deadly weapon . . ." In the present case, there was absolutely no evidence that Mr. Gentry actually caused physical harm to Officers Perkins. Thus, the relevant inquiry is whether there was sufficient evidence of an attempt to cause physical injury to Officer Perkins.
 {¶ 12} The statutory definition of attempt provides that "no person, purposely or knowingly . . . shall engage in conduct that, if successful, would constitute or result in the offense . . ." O.R.C. § 2923.02. A criminal "attempt" is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. Statev. Woods (1976), 48 Ohio St.2d 127. A "substantial step" requires conduct that is "strongly corroborative of the actors' criminal purpose." Id. This standard "properly directed attention to overt acts of the Defendant which convincingly demonstrate a firm purpose to commit a crime . . ." Id. at 132.
 {¶ 13} The Supreme Court has held that the conduct necessary for a criminal attempt need not be the last proximate act prior to the consummation of the felony. State v. Farmer (1951),156 Ohio St. 214. Ohio's statutory definitions of criminal offenses are based largely upon the American Law Institute's Model Penal Code. Comment 6(a) to Section 5.01 of the Model Penal Code explains the requirements of "Substantial Step" and Corroboration of Purpose.
 {¶ 14} "(a) Requirements of `Substantial Step' andCorroboration of Purpose. Whether a particular act is a substantial step is obviously a matter of degree. To this extent, the Code retains the element of imprecision found in most of the other approaches to the preparation-attempt problem. There are, however, several differences to be noted:
 {¶ 15} "First, this formulation shifts the emphasis fromwhat remains to be done, the chief concern of the proximitytests, to what the actor has already done. That further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial. It is expected, in the normal case, that this approach will broaden the scope of attempt liability.
 {¶ 16} "Second, although it is intended that the requirement of a substantial step will result in the imposition of attempt liability only in those instances in which some firmness of criminal purpose is shown, no finding is required as to whether the actor would probably have desisted prior to completing the crime. Potentially the probable desistance test could reach very early steps toward crime, depending on how one assesses the probabilities of desistance; but since in practice this test follows closely the proximity approaches, rejection of a test of probable desistance will not narrow the scope of attempt liability."
 {¶ 17} We are satisfied after reviewing the trial record that a reasonable jury could conclude beyond a reasonable doubt that Gentry was attempting to cause physical harm to Officer Perkins with a dangerous weapon. In short, Gentry's conduct was "strongly corroborative" of his purpose to harm Perkins with the pole.
 {¶ 18} Lastly, in weighing the evidence as we are required to do so in addressing a manifest weight assignment, we conclude that Gentry's conviction is not against the manifest weight of the evidence. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. Appellant's second assignment of error is also Overruled.
 {¶ 19} The judgment of the trial court is affirmed.
Wolff, J., and Glasser, J., concur.
(Hon. George Glasser, retired from the Sixth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).