OPINION. *Page 2 
{¶ 1} Following a bench trial, defendant-appellant Brandon Mincy was convicted of felonious assault, two counts of kidnapping, inducing panic, and disruption of public services. The offenses stemmed from an incident in which Mincy and another young man had boarded a Cincinnati Metro bus with a gun and terrorized the bus driver and passengers.
 {¶ 2} The indictment charged Mincy and Dante Allen as co-defendants. Mincy and Allen were tried together in a bench trial and were found guilty. Before they were sentenced, a young man named Derrick Smith admitted to having been Mincy's accomplice and said that Allen was not present at the time of the offenses. Mincy moved for a new trial based upon Smith's admission, but the trial court denied the motion and sentenced Mincy to six years in prison. Mincy now appeals.
 The Evidence at Trial {¶ 3} In the summer of 2005, ongoing disputes between gangs in two Cincinnati neighborhoods, Avondale and Bond Hill, had erupted into violence. And on June 6, 2005, a 16-year-old Avondale boy named Eugene Lampkin was shot to death in Bond Hill.
 {¶ 4} Several hours after the shooting, Angela Jones was driving a Cincinnati Metro bus on its route through Bond Hill. At the time, the bus was carrying about 20 passengers.
 {¶ 5} When Jones stopped at a bus stop in Avondale, two young men boarded the bus without paying. One of the men lifted his shirt and took a gun from his pants. The man held the gun sideways in his hand with his arm extended. *Page 3 
Initially, the man pointed the gun toward Jones. He then brandished the gun as he and his companion walked down the aisle of the bus.
 {¶ 6} As soon as the men had passed her, Jones pressed the bus's "panic button" to alert the Metro dispatchers to summon the police. As the two men paced back and forth in the aisle of the bus, one of them was crying. The men were yelling, "They shot my nigga. They killed my nigga." And the men demanded, "Who is the motherfucker on the bus from Bond Hill that killed my nigga last night?"
 {¶ 7} Jones testified that she did not continue driving because the men had a gun. She said, "I mean, I didn't know if they were going to start shooting us or what. I just froze. I panicked. I was very scared." Jones felt that if she had moved the bus, "they were going to start shooting."
 {¶ 8} Betty Davis, a bus passenger, testified that she felt she could not get off the bus: "I felt in the moment that had I done that, that would have created another reaction."
 {¶ 9} After a few minutes, the two men left the bus from its rear door. As they exited, one of them pointed the gun at the bus and moved the gun from left to right, like he was "going to spray the bus" with gunfire.
 {¶ 10} Jones drove the bus a few blocks and stopped to wait for police. Jones suffered chest pains and breathing difficulty, so she was taken to a hospital by ambulance.
 {¶ 11} Cincinnati Police Officer Phillip Penn, a resource officer for Mincy's high school, identified Mincy from the bus's videotape of the incident. Penn testified that he went to Mincy's home, where he saw, on the wall of his bedroom in graffiti, "A-1," an Avondale gang sign. Mincy was not at home. Mincy turned himself into police five days later. *Page 4 
 {¶ 12} At trial, Mincy testified that he had boarded the bus to speak to a girl he knew to be from Bond Hill. Mincy believed that someone from Bond Hill was responsible for his friend Lampkin's death because the shooting had happened in Bond Hill. Mincy testified that as soon as he walked to the rear of the bus, he kept repeating, "Who killed my nigga?" Mincy testified that he was crying, upset, and angry. Mincy admitted that he had never had a conversation directly with the girl "[b]ecause I was upset. I was just yelling."
 {¶ 13} Mincy testified that he did not have a gun and did not know if anyone else had a gun. Mincy denied making threats to anyone or stopping anyone from getting off the bus.
 {¶ 14} Mincy said that he did not know if anyone else had gotten on the bus when he did. Mincy testified that at some point he had seen the person who had gotten on the bus behind him, and that that person was not Dante Allen. Mincy admitted that he had walked up and down the aisle and that the person was directly behind him. Mincy testified that he was not aware of the person behind him until he turned around and got off the bus.
 {¶ 15} Mincy admitted that he had not paid a fare and that he had intended to get off the bus where he had gotten on.
 Motion for a New Trial {¶ 16} Mincy's first and second assignments of error challenge the trial court's denial of his motion for a new trial following what he calls a "non-evidentiary" hearing. The decision granting or denying a motion for a new trial, and the decision whether to hold an evidentiary hearing on the motion, are committed to the broad discretion of the *Page 5 
trial court.[1] Unless the trial court's decision is unreasonable, arbitrary, or unconscionable, a reviewing court should not disturb it on appeal.[2]
 {¶ 17} Mincy argues that Smith's statement to police constituted a surprise within the meaning of Crim.R. 33(A)(3), as well as newly discovered evidence within the meaning of Crim.R. 33(A)(6), and that, therefore, he was entitled to a new trial.
 {¶ 18} Under Crim.R. 33(A)(3), a new trial may be granted on the ground of "surprise which ordinary prudence could not have guarded against." To warrant a new trial, the claimed surprise must have materially affected the defendant's substantial rights.[3]
 {¶ 19} Crim.R 33(A)(6) allows a new trial to be granted on the ground of newly discovered evidence, where the defendant shows that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) could not in the exercise of due diligence been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.[4]
 {¶ 20} In this case, there is no dispute that Smith's statement to police had occurred after Mincy's trial and that it could not have been discovered prior to trial. But the statement did not materially affect Mincy's substantial rights or create a "strong probability" that a new trial would have resulted in his acquittal. *Page 6 
 {¶ 21} During Smith's interview with police, he admitted that he had been upset and angry about his friend Lampkin's murder. Smith admitted that he had gotten on the bus with Mincy, that Mincy had boarded before he did, and that Mincy was standing in front of him in the aisle when they asked who on the bus was from Bond Hill. Smith admitted that he and Mincy had walked to the back of the bus and exited through the back door. Smith said that Allen was not on the bus, and that he "was nowhere near the scene." Smith admitted that he had held a gun in his right hand while he and Mincy were on the bus. But Smith said that the gun was a toy.
 {¶ 22} Smith's admission to being Mincy's accomplice, while it may have helped Allen, likely would not have helped Mincy. Instead, Smith's admission corroborated the testimony of Jones and Davis that Mincy had been one of the perpetrators and that the two men had acted in concert as they terrorized the passengers with a gun. Essentially, Smith's admission confirmed nearly every aspect of the testimony by Jones and Davis, with the exception of one important item: whether the gun was real.
 {¶ 23} If at a new trial Smith had exercised his Fifth Amendment right against self-incrimination and declined to testify, Mincy would not have been able to introduce Smith's statement to police. Because of the statement's "questionable inadmissibility[,] * * * [it] could not have provided a 'strong probability' of an acquittal."[5]
 {¶ 24} Even assuming that Mincy would have been able to secure Smith's voluntary participation at a new trial, we hold that the "new evidence" did not disclose a strong probability of a different outcome. Smith's admission was largely inculpatory of Mincy, and Smith's statement that the gun he wielded was a toy was self-serving at best.
 {¶ 25} Conveniently, Smith's "toy gun" was untraceable. Smith did not know where he had gotten the alleged toy. In response to police questions, Smith said, *Page 7 
"Where else do you get a toy gun from? * * * You could find a toy gun. I found the toy gun." When asked where he had found it, Smith replied, "Down the way." Smith said, "I'm not about to buy no toy gun."
 {¶ 26} And Smith's "toy gun" was also unrecoverable. Smith could not tell police where the gun was at the time of the police interview. When asked where the toy gun was, Smith stated, "I don't know where it is at." Smith did not know where the gun was, but knew that it was not at his grandmother's house and that it had been "broke up somewhere."
 {¶ 27} The trial court heard all the evidence at trial, including the testimony by Jones and Davis that they believed the gun was real. The court was in the best position to judge their credibility. The court read Smith's statement and noted that it had not been made under oath or subject to cross-examination. The court also noted the possibilities that Smith would be later acquitted or that he would change his position. Given Smith's less than credible explanation about his "toy gun," the court reasonably concluded that Smith's statement would not have caused the court to acquit Mincy.
 {¶ 28} Because Mincy did not meet his burden of demonstrating that the new evidence disclosed a strong probability that it would have changed the result if a new trial was granted, we hold that the trial court did not abuse its discretion in denying Mincy's motion for a new trial. We overrule the first assignment of error.
 Hearing on Motion for a New Trial {¶ 29} In his second assignment of error, Mincy argues that the trial court failed to afford him a meaningful hearing on his motion for a new trial. Mincy contends that the court erred by accepting the prosecutor's "factual averments" without affording the *Page 8 
defense an opportunity to challenge by cross-examination the prosecutor's hearsay statements.
 {¶ 30} The record reflects that, at the hearing on Mincy's new-trial motion, the prosecutor stated that a police detective was prepared to testify that Smith had implicated Mincy and that Smith had said that he was carrying a toy gun. In lieu of the detective's testimony, the prosecutor accepted Mincy's stipulation as to the authenticity of the transcript of Smith's police interview.
 {¶ 31} The prosecutor also said, "[The detective] would indicate to the Court there was information that it was, in fact, a real weapon and that weapon was later sold to another individual now deceased." This synopsis of the detective's expected testimony was simply argument and not evidence. And it was largely cumulative of evidence presented at trial.
 {¶ 32} At trial, the court had heard evidence that the gun involved was real, not only from Jones and Davis, but from co-defendant Allen's statement to police as well. During Allen's cross-examination of Cincinnati Police Detective James Locke, the detective testified that he had interviewed Allen.
 {¶ 33} During Locke's interview with Allen, Allen said that Mincy had been on the bus with a person named Derrick. According to Locke, "[Allen] told me the kid's name was Derrick, and the kid was out of Chicago, and the kid would go from Greenwood back towards * * * North Shuttlesworth. He described the gun. He said it was a nine, a 9 mm, and he said the kid had got the gun from Chicago, the kid was from Chicago, and he made the trip back, and he said, nobody sees him, and he goes back. He gave me the description so clear of the other kid, the incident on the bus, that my assumption was, how does he know all of this." Locke testified that he had not been *Page 9 
able to locate "Derrick," and he also said that he was still looking for him at the time of trial.
 {¶ 34} Given that the prosecutor's statement was simply argument and that the trial court had already heard evidence that the gun involved was real, Mincy suffered no prejudice. We overrule the second assignment of error.
 Effective Assistance of Counsel {¶ 35} In his third assignment of error, Mincy argues that he was denied the effective assistance of counsel at the hearing on his motion for a new trial. Mincy contends that counsel's failure "to insist on an evidentiary hearing" or "to object to the introduction of testimonial evidence from out of court declarants" constituted ineffective assistance.
 {¶ 36} "Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial."[6]
 {¶ 37} We presume that Mincy's claim that the trial court did not hold an evidentiary hearing on his motion is based on appellate counsel's initial misapprehension of the record. But appellate counsel acknowledged at oral argument that the transcript of Smith's interview with police had been admitted into evidence at the hearing.
 {¶ 38} As to Mincy's contention that counsel had failed to object to hearsay statements made at the hearing, we note that the failure to make objections, by itself, *Page 10 
is not enough to sustain a claim of ineffective assistance of counsel.[7] Moreover, counsel probably recognized that the prosecutor's statements were nothing more than argument and that the trial court would be aware of the difference between evidence and argument. And as we have already held, the prosecutor's statements were not prejudicial.
 {¶ 39} Because Mincy has failed to demonstrate that defense counsel's performance was deficient, he cannot show that he was denied the effective assistance of counsel. We overrule the third assignment of error.
 Weight and Sufficiency of the Evidence {¶ 40} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[8] In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[9] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[10]
 A. Kidnapping {¶ 41} To find Mincy guilty of kidnapping in violation of R.C.2905.01(B)(2), the trier of fact had to find that Mincy had knowingly restrained Jones and Davis of *Page 11 
their liberty by force, threat, or deception, under circumstances that created a substantial risk of serious physical harm to the victims.
 {¶ 42} Mincy contends that he did not threaten the victims or prevent them from leaving the bus during the incident. But both women testified that they felt they could not move or leave the bus without being shot. Viewing the evidence in the light most favorable to the state, we hold that a rational trier of fact could have found the elements of kidnapping beyond a reasonable doubt.
 B. Inducing Panic {¶ 43} To find Mincy guilty of inducing panic in violation of R.C.2917.31(A)(3), the trier of fact had to find that Mincy had caused serious public inconvenience or alarm by committing the offense of kidnapping, with reckless disregard of the likelihood that the kidnapping would cause serious public inconvenience or alarm, and that this conduct resulted in physical harm to Jones.
 {¶ 44} The state presented sufficient evidence that Mincy had induced panic, where, in addition to causing great inconvenience and alarm to the passengers, the conduct of Mincy and his accomplice caused Jones to suffer chest pains and breathing difficulty.
 C. Disrupting Public Services {¶ 45} To find Mincy guilty of disrupting public services in violation of R.C. 2909.04(A)(2), the trier of fact had to find that Mincy had purposely, by any means, interrupted or impaired public transportation. "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender *Page 12 
intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."[11]
 {¶ 46} Mincy admitted at trial that he had boarded the bus without paying a fare, and that he had intended not to travel on the bus, but to get off the bus at the same spot he had boarded.
 {¶ 47} Although Mincy and his accomplice were on the bus for only a few minutes, their threatening conduct caused the driver to feel that she could not drive the bus during that time. Once the two men left the bus, the driver drove a few blocks away and waited for police. When the police arrived on the scene, several passengers remained seated on the bus while other passengers stood outside the bus. And Davis missed an appointment as a result.
 {¶ 48} Under these circumstances, we hold that the state presented ample evidence that Mincy had purposely interrupted or impaired public transportation.
 D. Firearm Specifications {¶ 49} To find Mincy guilty of the firearm specifications, the trier of fact had to find that Mincy or his accomplice had possessed a weapon that was capable of firing a projectile by means of an explosive or combustible propellant.[12] In determining whether a weapon is capable of expelling a projectile, "the trier of fact may rely on circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."[13]
 {¶ 50} In State v. Thompkins,[14] the Ohio Supreme Court affirmed a conviction on a firearm specification where the defendant had pointed a gun at the *Page 13 
victim, and told her that it was a holdup and to be quick. The court held that a rational jury could have concluded based upon the totality of the circumstances that the defendant had possessed an operable firearm.[15] And this court has held that "a victim's belief that the weapon is a gun, together with the intent on the part of the accused to create and use that belief for his own criminal purposes, is sufficient to prove a firearm specification."[16]
 {¶ 51} Here, the state provided sufficient evidence to prove the firearm specifications. The evidence demonstrated that Mincy or his accomplice had pointed a silver handgun at the driver and then walked back and forth in the aisle of the bus, brandishing the gun. Both Jones and Davis believed the gun to be real. When Mincy and his accomplice got off the bus, one of them made a spraying motion with the gun. Based upon the totality of the circumstances, a rational trier of fact could have found that a firearm had been brandished during the offenses.
 E. Complicity {¶ 52} In Ohio, a complicitor is prosecuted and punished as if he were a principal offender.[17] This means that a complicitor may be charged with and convicted of the principal offense.[18] To support a conviction for complicity by aiding and abetting pursuant to R.C.2923.03(A)(2), " 'the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' Such criminal intent can be inferred from the presence, *Page 14 
companionship, and conduct of the defendant before and after the offense is committed."[19]
 {¶ 53} In this case, on the evidence presented, the trier of fact could reasonably have found that Mincy had been either the principalor the complicitor in the kidnapping, inducing-panic, and disruption-of-public-services offenses, as well as in the accompanying firearm specifications. Officer Penn and Detective Locke testified that the bus's videotape showed Mincy's accomplice, not Mincy, holding the gun. But both Jones and Davis testified that Mincy was the one who had initially boarded the bus with the gun.
 {¶ 54} According to Jones and Davis, the videotape in evidence did not depict the entire episode. Instead, the tape consisted of a series of still images captured approximately every seventh second.
 {¶ 55} Davis acknowledged that the bus's videotape showed Mincy's accomplice brandishing the gun, and testified that she had "no clue" about when or how the accomplice had ended up with the gun. But she explained that the videotape did not portray the moments when the two men had boarded the bus.
 {¶ 56} Even if Mincy had not held the gun at any point during the offenses, the trier of fact could reasonably have found that he had aided and abetted his accomplice in the offenses. The evidence demonstrated that both men had boarded the bus without paying a fare. Both had walked back and forth in the aisle, yelling their demands to know which passengers were from Bond Hill, and to know who had killed their friend. And after terrorizing the passengers, the men had exited the bus together through its rear door. *Page 15 
 {¶ 57} According to the dissent, Mincy should get a new trial because he possibly would not be convicted of complicity with a misidentified principal. But as we have stated, Mincy was properly convicted for these offenses, whether as a principal or as a complicitor.
 {¶ 58} Even if we assume that Mincy was not the principal, his convictions as a complicitor in the principal offenses were based upon sufficient evidence. The state was not required to prove the identity of the principal.[20] So the trier of fact's inability to identify, or to correctly identify, Mincy's accomplice would not have prevented its finding that Mincy was guilty of the principal offenses.
 {¶ 59} The Ohio Supreme Court has addressed the issue of complicity where the principal cannot be identified. In In re T.K.,[21] several gang members approached a woman's home. Witnesses saw a handgun passed between the gang members and heard the defendant shout, "Shoot[.] * * * Shoot the [expletive]." Shots were fired, and the woman and her nephew were wounded. The defendant was convicted of two counts of felonious assault.
 {¶ 60} The Eighth Appellate District reversed the convictions because, on the evidence presented, the trier of fact could not identify the shooter or the intended target.[22] A unanimous Ohio Supreme Court reversed the judgment of the court of appeals.[23]
 {¶ 61} The supreme court held that the trier of fact's inability to identify the shooter did not prevent it from finding the defendant guilty of felonious assault because "the identity of the principal is not an element that the state must prove to *Page 16 
establish the offense of complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2)."[24]
 {¶ 62} So in this case, any misidentification of Mincy's accomplice was immaterial. Nothing changed the evidence against Mincy himself. The state presented ample evidence that Mincy was, at the very least, a complicitor in the offenses. Accordingly, we hold that Mincy's convictions for kidnapping, inducing panic, disrupting public services, and their accompanying firearm specifications were based upon sufficient evidence and were not against the manifest weight of the evidence.
 F. Felonious Assault {¶ 63} To find Mincy guilty of felonious assault, the trier of fact was required to find that Mincy or his accomplice had knowingly caused or attempted to cause physical harm to Jones by means of a deadly weapon.[25] Because the state does not contend that Mincy's conduct actually caused physical harm by means of a deadly weapon, we confine our analysis to whether the evidence could have reasonably supported a finding that he had attempted to cause physical harm with the gun.
 {¶ 64} As we have already held, the state presented sufficient evidence to establish that Mincy or his accomplice had brandished a firearm. To sustain Mincy's felonious-assault conviction, the state was required to present sufficient evidence that Mincy or his accomplice not only had brandished the firearm but had also tried to injure someone with it.[26] *Page 17 
 {¶ 65} To prove an "attempt" to cause physical harm by means of a deadly weapon, the evidence must demonstrate that the defendant knowingly engaged in conduct that, if successful, would have resulted in physical harm to another.[27] Proof of a criminal attempt requires evidence of a "substantial step in a course of conduct planned to culminate in [the] commission of the crime."[28] A "substantial step" requires conduct that is "strongly corrobative of the defendant's criminal purpose."[29]
 {¶ 66} Evidence that a defendant pointed a deadly weapon at another, without further evidence regarding the defendant's intention, is insufficient to sustain a conviction for felonious assault under R.C.2903.11(A)(2).[30] At best, such evidence would justify a conviction for aggravated menacing, because "the act of pointing a deadly weapon at another is essentially an equivocal act as it relates to the accused's intention to cause physical harm to another by use of that weapon."[31]
 {¶ 67} But "the act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use the weapon to cause harm, is sufficient evidence" to sustain a conviction for felonious assault under R.C. 2903.11(A)(2).[32]
 {¶ 68} In cases involving firearms, evidence that the defendant discharged or tried to discharge a firearm is "strongly corroborative" of an intention to cause harm.[33] More subtly but similarly corroborative of an attempt to cause harm is evidence of an act of pointing a gun at someone, combined with a threat that would indicate the actor's intention to use the gun. *Page 18 
 {¶ 69} For example, the Ohio Supreme Court has upheld a felonious-assault conviction under R.C. 2903.11(A)(2) where a defendant pointed a handgun at a woman's face during a volatile argument and threatened to kill her.[34] In another case, the court upheld a felonious-assault conviction where a defendant pointed a loaded, cocked, and operable rifle at police officers and shouted, "If you don't have a warrant get the fuck out of my house."[35]
 {¶ 70} In this case, there was no evidence of a discharge or an attempted discharge of the gun. So we must determine whether the state presented sufficient evidence of a threat combined with the act of pointing the gun at Jones.
 {¶ 71} Jones testified that she was facing the boarding passengers when she first saw the gun. When asked whether the gun was pointed at her, Jones testified, "I don't know if he intended to do it. I'm just looking at a gun, and I'm looking at a hole." When asked whether the gun was "pointed straight ahead where you [were]," Jones responded, "Yes."
 {¶ 72} Jones testified that she saw the barrel of the gun "pointed directly in front of" her. Jones clarified her account during cross-examination by Mincy's attorney:
 {¶ 73} "Q. * * * It's at that point someone points a gun in your face?
 {¶ 74} "A. No, I didn't say at my face, no. As he boarded, I said he pointed the gun where I could see the whole thing. It wasn't like he was up on me. When the person got up on the bus, the only thing I noticed was a silver gun with a hole. It's not like he walked up to me and put it up to my head, no.
 {¶ 75} " * * * *Page 19 
 {¶ 76} "Q. So, if I understand you correctly, he did point the gun at you or he didn't?
 {¶ 77} "A. He pointed the gun as he came up the steps. I'm looking at the hole in the gun before he walked away.
 {¶ 78} "Q. But he didn't point it at you?
 {¶ 79} "A. Well, if I am looking at a hole, he pointed it, but you said at my face. But you said he pointed it at my face.
 {¶ 80} "Q. * * * As this individual gets on the bus, was the gun pointed at you as he was passing by you, or did the individual just point it at you, and —
 {¶ 81} "A. And then he started walking. It wasn't like he was coming up in my face and my head. You said 'in my face[.]' If someone is pointing a gun at you, he can be where I say he was standing at, he pointed the gun and turned and walked."
 {¶ 82} On these facts, we cannot say that a rational trier of fact could have found that Mincy had attempted to physically harm Jones with the firearm. There was no evidence of a "substantial step" by Mincy or his accomplice that would have culminated in physical harm to Jones by means of the firearm.
 {¶ 83} We have no doubt that Mincy's conduct caused Jones to believe that he would cause serious physical harm to her, within the meaning of R.C. 2903.21(A), the aggravated-menacing statute. But given Jones' equivocal testimony about the brandishing of the firearm, as well as the dearth of evidence of an intent by Mincy or his accomplice to physically harm her with the firearm, we cannot say that the state presented sufficient evidence of felonious assault.
 {¶ 84} Accordingly, we sustain in part the fourth assignment of error to the extent that it challenges the sufficiency of the evidence supporting Mincy's felonious-assault conviction. *Page 20 
 Motion to Dismiss the Indictment {¶ 85} In his sixth assignment of error, Mincy argues that the trial court erred by overruling his motion to dismiss the indictment. In his appellate brief, counsel indicates that he "received a communication asking that a claim be included that [Mincy] was denied due process in that he was not indicted within fourteen days of the bindover of his case from Juvenile Court, on July 22, 2005, as required by Crim.R. 7."
 {¶ 86} Crim.R. 7(A) provides that where an accused has waived an indictment, the offense may be prosecuted by information. But if an information or indictment is not filed within 14 days of the waiver, the accused must be discharged and the complaint dismissed.[36]
But the rule is inapplicable in this case because there was no such waiver. We overrule the sixth assignment of error.
 Conclusion {¶ 87} Therefore, we reverse Mincy's conviction for felonious assault and its accompanying firearm specification and discharge him from further prosecution on that offense. In all other respects, the trial court's judgment is affirmed.
Judgment accordingly.
SUNDERMANN, J., concurs.
PAINTER, P.J., dissents.
[1] State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 85; State v. Hawkins (1993), 66 Ohio St.3d 339, 350,612 N.E.2d 1227; see, also, State v. Hall (Aug. 18, 2000), 1st Dist. No. C-990639, citing Toledo v. Stuart (1983), 11 Ohio App.3d 292, 465 N.E.2d 474;State v. Martin, 8th Dist. No. 87171, 2006-Ohio-4582, jurisdictional motion overruled, 112 Ohio St.3d 1444, 2007-Ohio-152, 860 N.E.2d 768;State v. Roper, 9th Dist. No. 22494, 2005-Ohio-4796, jurisdictional motion overruled, 108 Ohio St.3d 1440, 2006-Ohio-421, 842 N.E.2d 64;State v. White, 8th Dist. No. 82066, 2004-Ohio-5200, jurisdictional motion overruled, 105 Ohio St.3d 1453, 2005-Ohio-763, 823 N.E.2d 457;State v. Wright, 6th Dist. No. E-03-054, 2004-Ohio- 5228.
[2] State v. Adams (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.
[3] See Lamar, supra, at ¶ 82.
[4] State v. Petro (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus.
[5] Lamar, supra, at ¶ 86.
[6] State v. Newton, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 97, citing Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, and State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, paragraph two of the syllabus.
[7] State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791,842 N.E.2d 996, at ¶ 168, certiorari denied sub nom. Conway v. Ohio (2006), ___ U.S. ___, 127 S.Ct. 679; State v. Holloway (1988), 38 Ohio St.3d 239,244, 527 N.E.2d 831.
[8] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[9] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[10] Id.
[11] R.C. 2901.22(A).
[12] R.C. 2923.11(B)(1).
[13] R.C. 2923.11(B)(2).
[14] Thompkins, supra, 78 Ohio St.3d 380, 1997-Ohio-52,678 N.E.2d 541.
[15] Id. at 383-384, 1997-Ohio-52, 678 N.E.2d 541.
[16] State v. Jeffers (2001), 143 Ohio App.3d 91, 95, 757 N.E.2d 417, citing State v. James (Dec. 22, 1994), 1st Dist. No. C-930618, andState v. Green (1996), 117 Ohio App.3d 644, 691 N.E.2d 316.
[17] R.C. 2923.03(F).
[18] R.C. 2923.03(F); State v. Herring, 94 Ohio St.3d 246,2002-Ohio-796, 762 N.E.2d 940.
[19] In re T.K., 109 Ohio St.3d 512, 514, 2006-Ohio-3056,849 N.E.2d 286, at ¶ 13, citing State v. Johnson, 93 Ohio St.3d 240,2001-Ohio-1336, 754 N.E.2d 796.
[20] Id. at ¶ 14.
[21] Id.
[22] Id. at ¶ 4.
[23] Id. at ¶ 18.
[24] Id. at ¶ 14.
[25] R.C. 2903.11(A)(2).
[26] Id.
[27] See R.C. 2923.02(A); see, also, R.C. 2903.11(A)(2).
[28] State v. Green (1991), 58 Ohio St.3d 239, 241, 569 N.E.2d 1038, quoting State v. Woods (1976), 48 Ohio St.2d 127, 357 N.E.2d 1059.
[29] Id.
[30] State v. Brooks (1989), 44 Ohio St.3d 185, 542 N.E.2d 636, syllabus.
[31] Brooks, supra, at 192, 542 N.E.2d 636.
[32] See Green, supra, at syllabus.
[33] See Brooks, supra, at 192, 542 N.E.2d 636.
[34] Id.
[35] Green, supra, at 241-242, 569 N.E.2d 1038.
[36] Crim.R. 7(A). *Page 21