[Cite as *State v. Elmore*, 2017-Ohio-1472.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. 16CA52 |
| | : | |
| ANTHONY QUITON ELMORE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Richland County Court
of Common Pleas, Case No. 2015 CR
0823 R



JUDGMENT:     AFFIRMED



DATE OF JUDGMENT ENTRY:     April, 19, 2017



APPEARANCES:

For Plaintiff-Appellee:                          For Defendant-Appellant:

BAMBI COUCH-PAGE                       DAVID M. WATSON
RICHLAND CO. PROSECUTOR          3 North Main St., Ste. 702
DANIEL M. ROGERS                        Mansfield, OH 44902
38 South Park St.
Mansfield, OH 44902

*Delaney, P.J.*

{¶1} Appellant Anthony Quiton Elmore appeals from the July 20, 2016 Sentencing Entry of the Richland County Court of Common Pleas. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} The events that led to this case began in Steubenville, Jefferson County, Ohio, where there is ongoing criminal gang activity. Jane Hanlin prosecuted appellant as an assistant prosecutor in the Jefferson County Prosecutor's Office and also as the elected county prosecutor in that office. Relevant here, Hanlin prosecuted appellant in two separate cases which caused him to be incarcerated in the Mansfield Correctional Institution ("ManC.I.").

*The Steubenville shooting case*

{¶3} Appellant's criminal history includes affiliation with criminal gangs. Steubenville has ongoing gang violence between individuals from Steubenville and others coming to the city from Chicago, to the extent the two groups are known to shoot each other on sight. Appellant and his co-defendant William Ross were on a porch when the victim from Chicago, Torrance Lida, walked by with a group of friends. The two groups "flexed" each other, or acknowledged they saw each other. Appellant chose not to open fire on Lida immediately because there were witnesses nearby. Instead, he and Ross ran through woods intending to cut off and ambush the Lida group, planning to shoot Lida in the back.

{¶4} As they approached, however, Ross fell and fired his weapon, alerting the Lida group to their presence in the woods. Lida fired back and Ross was struck in the buttocks. Appellant fired his weapon.

{¶5} Ross cooperated with the state of Ohio and testified against appellant. Appellant was convicted of one count of felonious assault with a firearm specification and one count of having weapons while under disability. He was sentenced to an aggregate prison term of 14 years: 8 years for felonious assault, consecutive to 3 years for the firearms specification, consecutive to 3 years for having weapons while under disability. Ross was also convicted and sentenced to a prison term of 5 years. Appellant was sent to serve his term in ManC.I. and Ross was sent to Marion Correctional Institution.

{¶6} While imprisoned at Marion, Ross received a letter from appellant with a completed affidavit attached for him to sign. The letter threatened that if Ross did not sign the affidavit and return it to appellant by a certain deadline, appellant would reveal discovery paperwork from his case to appellant's associates at Marion. The paperwork included statements to law enforcement and portions of trial transcript revealing Ross to be a "snitch." The attached affidavit recanted Ross' testimony; it purported to absolve appellant of culpability in the Steubenville shooting, stating appellant did not want to pursue the Lida group but Ross insisted; appellant only shot his weapon to scare off the group after they shot at Ross; and appellant was wrongly accused and "oversentenced."

{¶7} Ross never followed through with appellant's instructions to recant, and Hanlin testified recantation would have been useless because appellant gave a videotaped interview to law enforcement in which he bragged about instigating the

shooting, admitting he was only prevented from shooting Lida in the back on sight by the presence of witnesses.

*The Mingo Junction home invasion*

{¶8}   Appellant was involved in another crime in which he and two co-defendants, Stedmund Creech and Drake Burton, dressed as construction workers and paid a female to drive them to a house in Mingo Junction.   The three posed as cable workers and knocked at the door of the house.  When a two-year-old answered the door, they forced their way in and demanded cash and drugs.  The three pistol-whipped a woman in the house when she could not keep the two-year-old quiet, and then pistol-whipped the two-year-old, causing injuries requiring her to be life-flighted to a children's hospital in Pittsburgh.   They also pistol-whipped a 13-year-old child and threatened to shoot the father in front of his family.  Before leaving, they shot the father in the leg.

{¶9}   Appellant was offered a plea deal of ten years to be served concurrently with the 14 he was already serving, an offer which was pending at the time the events in the instant case unfolded.

*Life at ManC.I.*

{¶10} ManC.I. is a level-three institution in the Ohio prison system, intended for inmates who can't follow the rules elsewhere or who are considered to be above-average security threats.

{¶11} Appellee's Exhibit 3 is an aerial photograph of Man.C.I. showing a ring of separate housing areas, a completely separate segregation unit, a library, gym, and other facilities.  Inmates are housed in the separate "pods" with little to no interaction between the pods; the groups of prisoners have separate "chow" and recreation times.  Some pods

are lockdown pods in which the residents are not allowed out of their cells at all or are out for very limited periods.

{¶12} Every detail of inmates' daily lives at ManC.I. is governed by rules. Upon arrival at the institution, inmates are sent to an orientation center where they receive a rule book. Infractions of prison rules result in "tickets" issued to inmates and discipline such as time spent in the "hole," or segregation unit. Inmates must have passes to permit travel to different segments of the prison, and being found somewhere without permission results in an "out-of-place" violation. Inmates have access to telephones but all calls are monitored, as are visitor lists. Inmates' mail is checked and may be censored if found to be a security threat. Purportedly inmates have no access to the internet, even at the law library. Cell phones are prohibited. Unmonitored cell phone calls would give inmates unfettered access to the outside world.

{¶13} Despite these rules, violations are rife. A corrections officer testified that at least one contraband cell phone a day is found within the facility. The main sources of contraband are packages thrown over the fence and corrupt staff bringing items in. Cell phones sell for as much as $1000-1500 within the prison; inmates rent the phones from each other. Inmates use PayPal as one means of paying for contraband; although inmates are prohibited from having PayPal accounts, it is not uncommon to find references to 10-digit PayPal numbers which they use to buy contraband and influence staff and each other. The PayPal accounts are replenished by people outside the facility. Drug use is not uncommon; the inmates in this case smoked marijuana together and appellant was once prosecuted for attempting to bring marijuana into a prison facility. Inmates also have access to the internet and to social media; appellant, or someone on

his behalf, posted images of himself singing and dancing on Facebook and Instagram while incarcerated.

{¶14} Gang activity is prohibited by prison rules but gangs proliferate. A "gang" is defined as any group the Department of Rehabilitation and Corrections has not authorized to exist. Gang activity is monitored by an investigatory unit in the prison which manages the gang population and gathers intelligence on gang members by scanning inmates' emails, phone calls, mail, and visitor lists. The gang team keeps information on each inmate called a "Security Threat Group Informational Institutional sheet," or STGII screen, which tracks the inmate's gang affiliation upon entering the institution, nicknames and/or street names, tattoos, and levels of participation. A gang member may be passive, active, or disruptive. Appellant's conviction in the Steubenville shooting case included a finding of gang participation. Pursuant to his STGII screen, appellant's affiliation upon entering ManC.I. was "Blue Devil Crip" and his gang activity in the prison was described as "passive," although appellant was apparently ticketed for a "Rule 17" violation involving a gang fight. Gang investigators were aware appellant's visitor list included a person known to be in contact with other Crips inside the prison, including top-ranking leaders in the organization.

*Random shakedown leads to the "Chizzle Letter"*

{¶15} On March 12, 2015, Corrections Officer Wheatcraft was assigned to conduct random searches of cells in the 4-A pod, to which appellant was assigned. Inside appellant's cell, under the mattress of the top bunk, Wheatcraft discovered a "kite" envelope. A kite is a means for inmates to contact staff members inside the institution. A kite is properly completed with an inmate's name and number and placed inside a

mailbox; upon receipt by the staff member, the kite is read, signed in red, and sent back to the inmate.  The kite is not designed to be sent outside the facility.  The "kite" in this case was admitted at trial as part of appellee's Exhibit 1.  The "Number" of the purported sender is "CHEZ," the "To" line is blank, and the "Issued by" staff member signature line states "LAC."  Appellant's street name is "Cadillac" or "Little Lac."

{¶16} Inside the kite, Wheatcraft found a letter which was not addressed to any staff member.  He quickly scanned the letter for gang references but immediately recognized the seriousness of what he found and turned the letter over to a sergeant. The following is the letter found in appellant's cell.

*Letter found on March 12, 2015, the "Chizzle" letter:[1]*

Chizzle:[2]

Bro, what's good?  I kno you pissed I'm fucking up the bid back this bitch but I should be out this bitch in two weeks, but they might come get me before that.  They offered me 14, [crossed out] 10 years, and to run it concurrent, so I'm taking it and I'm going to try to fight off my appeals that way, and I'll try to give them something back.[3]  Feel me?  But mean time, in between time, little bruh, I need

---

[1] The original handwritten letter was admitted as appellee's Exhibit 1 and a typewritten transcription of the letter was admitted as appellee's Exhibit 1-A.  Two witnesses read the letter into the record.  The text of the letter here is taken from the witnesses' testimony as to what the letter contained.

[2] Appellant told investigators "Chizzle" was someone he had been incarcerated with before, who was also at Man.C.I. when appellant first arrived but was released shortly afterward.

[3] The state of Ohio offered appellant a plea deal in the Mingo home invasion, including a sentence of 10 years to the run concurrently with his 14-year sentence in the shooting case.

you.  If you with the shit's bruh, and this could get me home in two summers, if that, little bruh.  It's some real shit too.  You know Kent State close to Akron, and the move I need you to pull is some thorough shit.  I'm going to have my dad and two of my little cousins with you.  I just need the help, bruh.  And I recognize the real in you and this move is too easy.  I know you like, what the fuck is it, so let me tell you what I got in mind.

The prosecutor in my case, her son goes to Kent State.  His name is [John Doe].  My girl goes to school with him.  She gonna get his schedule and shit.  But the plan is to snatch him up and hold him for ransom for one month.

Two quick demands.  One is to bring Drake Burton back to court and knock 20 years off his sentence.[4]  Two is to bring Anthony Elmore, "me," back to court and throw out the Mingo case and my other case, drop the felonious assault, and just charge me with weapons under (*sic*).  Give me 18 months or a year for it.  She has exactly one month to do it or else her son disappears and ask her what does she choose fake justice or her son's life.

After that, no more communicating with her until she makes her next move.  Tell her you'll be watching to see if she cooperates.

---

[4] Drake Burton is one of appellant's co-defendants in the Mingo Junction home invasion case.

Once she does, her son will be back unharmed. Tell her to keep things quiet and we'll be in contact.

Call from her son's phone, then throw it away in a river or something. Make sure the battery disconnected afterwards or break it, then get rid of it.[5] The next time you talk to her, call block, make sure you get the number out the phone from her son's.

Now here's the thing, my nigga. I know I'm making all this seem too easy, but I know my pop's with the shit. If you can't get no toys, my cousin will come through with them.[6] I just need you on this, bruh. If you do come through, I'm in debt with you for a lifetime, whatever, whenever, bruh. Real shit. My people's got it out in Cali. I just gotta be on hand to get it. Once I do, I'll break bread with you 50/50. That's on my daughter, bruh.

I understand if you don't want to neither. Just get rid of this letter for me and so be it. So be it. Feel me. But if you with this shit, everything will be provided to you. All you gotta do is welcome my pops and two little cousins to the A with open arms and find a friend with Ls who can rent a small U-Haul. At the end of this letter, I'm going to give you my dad's info and both my little cousins. All you gotta do is hit them up. Ask them as they trying to help their cousin out and they gonna be game.

---

[5] Destroying the battery of the cell phone would prevent law enforcement from using the "Find my iPhone" feature and would disable any G.P.S. or I.P. address for the phone.
[6] "Toys" are firearms.

Please stress to my dad that we gotta feed this kid for a month, but we will not harm him at all. If shit don't play out in six to eight weeks, cut him loose somewhere in the A, Columbus or Pittsburgh. All we need is duct tape, toys, a U-Haul, and a spot for little buddy to chill, at a garage, basement, somewhere where nobody goes or nothing. My pops will figure out that, though.

I need you all to be super careful, watch for cameras. Don't have no fingerprints. Wipe everything down. Don't speak around the little dude. Nothing. Keep him blind and deaf at all times. Don't speak in that U-Haul because the walls are aluminum and you can hear people in the front talking through that bitch. Other than that, everything should be a walk in the park. Post up outside his crib just chilling. When you see the duck, force him into the U-Haul. Tape him up. Call his mom in a funny voice and let the game begin.

Shit should go smooth. Once you get him tied up, don't let him move for shit, the bathroom or nothing. Just keep feeding him food or water. Fuck it, let him stink. He'll be all right. I'm passing this letter off in confidence, bruh, from my hand to yours. Don't put none of them dudes in our mix. It's strictly business between us, bruh. This shit real. You can't trust niggas these days. But I trust you, bruh, because you already showed me you with the shit and you short time me, so I know this letter is either a hit or a miss.

I'm going to give you my girl's number too. Make sure you call her block, bruh. We don't want to leave no trails or make no connection. Feel me? We going out smart—we gonna outsmart the system on this one. My girl will wait for your call. When she says, "the Ohio River's current is high," that means release little dude. Everything cool but keep calling her block to check up on everything, because remember, she can't call you because you called her block. You're officially family. All this gang shit, we brothers in life, we locked in. Fuck all this game shit. We brothers on life. We locked in. But once you make your decision here, go to the numbers and get everybody on deck and fill them in.

[List of names and numbers, including "Pops," "Pumpkins," little cousins Janard and Tae, "my girl Dominique," and "my cousin Rocket for the toys."]

Any money needed to cover anything, tell my sisters, or my nigga Jantana. [ ]. Don't tell them nothing. Just say it's to help me. They'll pay whatever to get shit handled. It's all on you now, bruh. Let me know what you on. Aite? It's all love. Stay up. Be safe at all cost. If you ain't feeling it, then abort shit, because last thing we need is any of you all here with me.

*Cell phone and second letter are found in Unit 2-D*

{¶17} On March 14, 2015, around 4:30 a.m., prison staff performed a shakedown of Unit 2-D because a corrections officer suspected an inmate was using a cell phone.

The inmates were removed from the cell and taken to a day room while the search was underway. On the way to the day room, they passed an ironing board. A corrections officer later saw a flashing light under the ironing board and discovered a cell phone secreted under the ironing board.

{¶18} In the cell of Inmate Spy and Inmate Hayes, on the top bunk, Corrections Officer Maze found a letter penned by appellant. Maze glanced through the contents of the letter and immediately contacted supervisors because he realized the letter discussed a kidnapping plot.

{¶19} Appellant was housed in a different pod at the time and would ostensibly have had no means of getting the letter to the location where it was found on the top bunk of Inmates Spy and Hayes.

*Letter found March 14, 2015, the "C-Hood" letter*

[Top right corner number for "C-Hood."][7]

Have him call you back from another line because this line hot, bruh. Real shit. Tell him I said it's time to get serious with these white people. Tell him I want to snatch up her son I got the Squad to do it. Just need the toys and the money to put everything in motion. Once everything is in motion, we get Jigg back in court, get 20 knocked off his sentence, get both my cases dismissed and his, too, and then she resigns afterwards.[8] We hold her son for one month, contact her one time with demands. After that, just chill. See

---

[7] "C-Hood," Cory Lion, is another convicted state and federal felon from the Steubenville area.

[8] "Jigg" is appellant's co-defendant in the Mingo case, Drake Burton.

how shit play out.  We going return homie, but we gotta play our cards right cause they forced our hands.  Tell him he ain't gotta do shit.  Just come through when the right numbers call you.

My little cousin Vontae going hit him up.  We going from there. Tell him I'll call him Friday morning to see if he with it.  Tell him get a U-Haul from Pittsburgh.  My dad going get at him sometime this weekend, but we ain't trying to do nothing till, like, April or May.  And if they ask for mileage, say you moving to Toledo or Columbus.

But Imma link up with my family and I'll let him know when it's a go so we can turn up on these people.  Shit goin run smooth.  Dom going get his (her son's) schedule and we be ready after that.  Let him know I need 100 for some tobacco, too, so I can start stacking up and helping with the money on my end.  Tell him how to do it or send it to court and you grab me some caps, bruh.  I'll get them this weekend, but if you can grab it now for me, you know I'm good, bruh. Tell him I knocked a roller, too, but I can't do shit till next month.[9]  But dude want a stack for two pounds and a phone, but will talk about that at a later date.

That's all, bruh.  Please let him know you my nigga.  You like my brother and I trust you with my life or I wouldn't use you to get him.  I would have waited.  Two more things before I bounce, though.

---

[9] A "roller" is a corrections officer.  To have "knocked a roller" means to have a "dirty" corrections officer under an inmate's influence.  Appellant testified this statement was a lie and merely braggadocio.

One is don't stop using GTL.[10]  At least make two calls a day to make everything look normal.  JPay too.[11]  Try not to be on the phone in the daytime.  Just use that bitch at night cause they ain't scanning then.  Be safe, bruh.  We thinking longevity.  And two, text my cousin Rocket, 740-632-9093, and tell him send Dom 100 for me.  Aite? Hold shit down, bruh, and be smart.  I'll be over there soon.  Hopefully I'm ghost.  Tell that nigga I said to that today.  Don't just say aite. And I'm cool on the TV.  My sister ordered it.  Go and look, bruh. And you the dicks.  Make sure court brings Dom, bruh.  I owe you real shit.  Tell P he dead on that 30 since you don't fuck with him no more.

{¶20}  "Dom" is Dominique Freeman, appellant's girlfriend with whom he was in frequent contact.  Hanlin monitored the couple's phone calls when she prosecuted appellant and noted despite the $9-10 charge per call, appellant and Freeman spoke "constantly."  Freeman is a student at Kent State University and is employed in the management office of a student housing complex where she has access to residents' schedules, vehicle descriptions, and keys.  Hanlin identified a BMV photograph of Freeman and identified Freeman as one of the women pictured in appellee's Exhibit 17, a photo downloaded from the cell phone found under the ironing board.

---

[10] "GTL" is the monitored prison phone system.

[11] "JPay" is a device similar to an iPad, but without internet access, which inmates can rent from the institution upon which they can download games and music.  JPay can be used to send email and videos but the content is monitored and screened before it is sent out of the institution.

{¶21} Hanlin's adult son "John Doe" is also a student at Kent State and lives in the housing complex managed by Freeman. As an athlete, Doe has a regimented schedule and his whereabouts are easily observed by office staff. Doe's records on file at the housing complex include his family's home address, phone numbers, and emergency contact information.

{¶22} Appellee's evidence included Exhibit 27, a well-worn handwritten page of phone numbers and email addresses used by appellant. Numbers in Exhibit 27 matched numbers provided in the letters, including for "Dom," "Pops," "Chizzle," "Tae," "Janard," and "Rocket," among others.

{¶23} Trooper Butler of the Ohio State Highway Patrol interviewed appellant twice and both interviews were recorded. In an interview on April 21, 2015, Butler asked appellant about the "Chizzle" letter. Appellant said it was something he wrote to "vent" shortly after he found himself in prison again, while he was still angry about the circumstances although he wasn't any longer. Appellant thought he threw the letter away but the corrections officer found it inside a kite in his legal paperwork. Appellant denied knowing who the letter was about because he "wrote so many letters" and didn't know which one specifically Butler referred to. Appellant admitted he wrote the letter, but denied it was addressed or sent to "Chizzle." When asked who he wanted to kidnap, appellant said it could have been anyone because he was at first angry and venting about kidnapping anyone associated with his cases. Appellant said he always had the ability to "abort" a scheme and Butler responded that he had already conspired to commit the scheme. Appellant's response was that he could ask anyone to do anything but no one

would follow through because he had no money or other means of making anyone follow through.

{¶24} Appellant denied having access to a cell phone and said he was careful about what he wrote in his outgoing mail or JPays because in 2010 he "caught a case" for writing to a relative and asking her to bring contraband into a prison. Butler then told him they found a second letter, similar to the first, connected with a cell phone and investigators had a search warrant to download the contents of the phone. Appellant said he would be glad for them to do so because there would be no evidence tying him in any way to the cell phone.

{¶25} Butler interviewed appellant again on August 11, 2015, and this time appellant was not as cordial because law enforcement had been "harassing" his friends and family. Butler asked appellant more about the circumstances of the discovery of the "C-Hood" letter and appellant denied passing the letter to Spy or Hayes. Butler responded that one of the inmates told him appellant gave them the letter to mail out of the facility, and appellant said Butler was lying because he had no connection with the other inmates. Appellant denied passing the "C-Hood" letter to anyone else and said he had no idea how it came to be in the possession of other inmates.

{¶26} Appellee called Christian Brown, a Man.C.I. inmate, to testify against appellant at trial. Brown is associated with the "Bloods" and although it is against gang rules to snitch, he felt it was also against gang rules to go after a prosecutor's family members, thus when he became aware of appellant's plot to kidnap a prosecutor's son, he contacted investigators. Brown also admitted he hoped cooperation would lead to intervention by appellee to help him gain judicial release or transfer to a different facility.

{¶27} Brown had been incarcerated in a limited-movement pod with appellant and while talking to another gang member, Brown heard about the plot to kidnap Hanlin's son. Brown said he was "kicking it" with appellant in the facility and they smoked marijuana together. Appellant said he needed another inmate to set up a three-way phone conversation for him so he could talk to someone on the street in Steubenville. Brown facilitated the conversation. Appellant told Brown the names of two people who would help him, including "Jay Rock" and "Cut Cut." "Cut Cut" was supposed to handle the plot outside the prison and hold the victim until appellant's charges were dropped. Appellant told Brown two of his letters had been intercepted.

{¶28} Appellant testified on his own behalf at trial and denied having any conversations with Christian Brown, much less smoking marijuana with him. Appellant said he wrote many letters similar to those found in this case, and that he offered the other letters to corrections officers but they weren't interested. He said the letters were written shortly after he arrived at Man.C.I. in June 2014, and he didn't realize the letters still existed because he thought he had thrown them away. Appellant said the "Chizzle" letter never left his cell, and he had no idea how the "C-Hood" letter came to be in the cell of Spy and Hayes. Appellant testified Spy was his neighbor in the facility before he was moved, but denied giving the letter to Spy to mail. Appellant insisted the letters were written to "vent" his anger and that he never actually communicated about the details of the kidnapping plot to anyone, including Freeman, his father, or any other family members. He disagreed with Hanlin's identifications of people in the pictures found in the cell phone, including of Dominique Freeman. He also testified he was no longer involved in any gang and that he didn't take part in any gang activities at Man.C.I., although he

admitted he was ticketed for a gang fight after he was purportedly "jumped out" of the gang.[12]

{¶29} Appellant was charged by indictment as follows:  Count I, conspiracy to commit kidnapping pursuant to R.C. 2923.01(A)(1)/2905.01(A)(1) and/or (A)(5), a felony of the second degree; Count II, attempted kidnapping pursuant to R.C. 2923.02(A) and 2905.01(A)(10 and/or (A)(5), a felony of the second degree; Count III, attempted extortion pursuant to R.C. 2905.11(A)(1) and/ or (A)(2) and/or (A)(4), a felony of the fourth degree; and Count IV, falsification pursuant to R.C. 2921.13(A)(3), a misdemeanor of the first degree.

{¶30} Appellant entered pleas of not guilty and the matter proceeded to trial by jury.  The trial court dismissed Count I, conspiracy to commit kidnapping, "for failure to allege an overt act in the indictment."  Appellant was found guilty upon the remaining counts.  The trial court proceeded to immediately sentence appellant to consecutive prison terms of 8 years upon Count II and 18 months upon Count III, concurrent with a jail term of 6 months upon Count IV.

{¶31} Appellant now appeals from the trial court's Sentencing Entry of July 20, 2016.

{¶32} Appellant raises two assignments of error:

---

[12] Appellant contended he was beaten out, or "jumped out," of the Crips on December 24, 2015.

**ASSIGNMENTS OF ERROR**

{¶33} "I. APPELLANT'S CONVICTION FOR ATTEMPTED KIDNAPPING WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶34} "II. APPELLANT'S CONVICTION FOR ATTEMPTED EXTORTION WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**ANALYSIS**

I., II.

{¶35} Appellant's two assignments of error are related and will be considered together. Appellant argues his convictions for attempted kidnapping and attempted extortion are against the manifest weight and sufficiency of the evidence. We disagree.

{¶36} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶37} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶38} R.C. 2923.02(A), attempt, states, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." Appellant was found guilty upon one count of attempted kidnapping pursuant to 2905.01(A)(1) and/or (A)(5). Those sections state:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> (1) To hold for ransom, or as a shield or hostage;
>
> * * * *.

(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority;

* * * *.

{¶39} Appellant was also found guilty upon one count of attempted extortion pursuant to R.C. 2905.11(A)(1) and/or (A)(2) and/or (A)(4). Those sections state:

(A) No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall do any of the following:

(1) Threaten to commit any felony;

(2) Threaten to commit any offense of violence;

* * * *.

(4) Utter or threaten any calumny against any person;

* * * *.

Appellant argues his convictions are against the manifest weight and sufficiency of the evidence because there is no evidence he took any substantial step to cause the cell phone and the "C-Hood" letter to be found in another inmate's cell, and there is no evidence he communicated the plan to kidnap the victim to anyone else. We disagree with appellant's characterization of the evidence and his resulting arguments.

{¶40} We find the existence of the plan detailed in the letters and the circumstantial evidence of the movement of the second letter to constitute "substantial steps" which strongly corroborates appellant's purpose in carrying out the kidnapping scheme. The Ohio Supreme Court has elaborated on the statutory definition of "attempt"

in R.C. 2923.02(A) as follows: "A 'criminal attempt' is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus. A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose." Id. "[T]his standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent." Id. at 132.

{¶41} We find the facts of the instant case to be similar to those of *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 97, in that appellant did more than "merely solicit" the crime in question; instead, "[h]e took all action within his power, considering his incarceration, to ensure that the crime would be committed." Although appellant denied ever discussing the kidnapping plot with Freeman, in the C-Hood letter he implicitly acknowledges that he is aware Hanlin's son is in the residence hall managed by Freeman, and she has access to the victim's schedule. It is readily apparent there was discussion about Freeman's access to information on the victim's whereabouts.

{¶42} Appellant's acts— soliciting his criminal associates to kidnap and hold John Doe, providing those associates with information about Doe's whereabouts at school, passing the C-Hood letter on to other inmates for transmission from the prison, and providing associates with the necessary contact information for the named co-conspirators who will undertake the plot, and transferring the letter to other inmates for transmission from the facility—strongly corroborate his criminal purpose, and therefore constitute a substantial step in a course of conduct planned to culminate in the kidnapping

of John Doe and the extorting of Hanlin. See, *Group*, supra, 2002-Ohio-7247 at ¶ 103.

Here, the steps taken by appellant convincingly demonstrate a firm purpose to commit

the crimes of kidnapping and extortion. *State v. Smith*, 5th Dist. Richland No. 2011-CR-

3470, 2012-Ohio-2956, ¶ 38. We conclude that there was sufficient competent and

credible evidence presented to the jury to convince the jury beyond a reasonable doubt

that appellee had proven each element of each of the offenses.

{¶43} Whether the woman in the photo on the cell phone is Freeman, and whether

appellant transmitted the "C-Hood" letter and the cell phone to Spy's cell, were for the jury

to decide. *Smith*, supra, 2012-Ohio-2956 at ¶ 40. Ultimately, "the reviewing court must

determine whether the appellant or the appellee provided the more believable evidence,

but must not completely substitute its judgment for that of the original trier of fact 'unless

it is patently apparent that the fact finder lost its way.'" *Id.*, quoting *State v. Woullard,* 158

Ohio App.3d 31, 2004–Ohio–3395, 813 N.E.2d 964, ¶ 81. In other words, "[w]hen there

exist two fairly reasonable views of the evidence or two conflicting versions of events,

neither of which is unbelievable, it is not our province to choose which one we believe."

*Id.*, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). The

weight to be given to the evidence and the credibility of the witnesses are issues for the

trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one

of the syllabus.

{¶44} The jury was free to accept or reject any and all of the evidence offered by

the parties and assess the witness's credibility. "While the jury may take note of the

inconsistencies and resolve or discount them accordingly * * * such inconsistencies do

not render defendant's conviction against the manifest weight or sufficiency of the

evidence." *Smith,* supra, 2012-Ohio-2956*,* at ¶ 41, citing *State v. Nivens,* 10th Dist. No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*, citing *State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶45} We find appellant's convictions are supported by sufficient evidence and that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury was in the best position to evaluate this competent, credible evidence, and we will not substitute our judgment for that of the trier of fact. The jury neither lost their way nor created a miscarriage of justice in finding appellant guilty. Appellant's two assignments of error are overruled.

## CONCLUSION

{¶46} Appellant's two assignments of error are overruled and the judgment of the Richland County Court of Common Pleas is affirmed.

By: Delaney, P.J.,

Wise, John, J. and

Wise, Earle, J., concur.